Gerald SMITH, Appellant,

v.

William ARMONTROUT, Appellee.

No. 88–2359.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 15, 1988.
Decided Dec. 8, 1988.

C. John Pleban, St. Louis, Mo., for appellant.

Stephen Hawke, Asst. Atty. Gen., Jefferson City, Mo., for appellee.

Before LAY, Chief Judge, and HEANEY, McMILLIAN, ARNOLD, JOHN R. GIBSON, FAGG, BOWMAN, WOLLMAN, MAGILL, and BEAM, Circuit Judges, en banc.

ARNOLD, Circuit Judge.

This is a habeas corpus case initially brought by Gerald Smith, a Missouri state prisoner under sentence of death. On September 29, 1988, a panel of this Court denied a certificate of probable cause, thus effectively dismissing the appeal from the judgment of the District Court, which had dismissed the habeas petition on its merits. Smith v. Armontrout, 692 F.Supp. 1079 (W.D.Mo.1988) (Wright, C.J.). Our panel took this action because Smith himself had asked for it, and the panel was convinced of his legal capacity to make that decision. Smith v. Armontrout, 857 F.2d 1228 (8th Cir.1988) (per curiam).

The Missouri Public Defender Commission and Terry Brummer, Director of the Office of the State Public Defender, who had been acting as next friends to try to prevent Smith's execution, then filed a petition for rehearing by the panel, with suggestions for rehearing en banc. This petition was filed on September 30, 1988. Smith's execution had been set by the Supreme Court of Missouri for October 4, 1988, and no stay of execution was in effect. While the petition for rehearing was pending, and before we had ruled on it, three Members of this Court, acting as individual circuit judges, granted an emergency temporary stay of the execution. They did so to afford themselves time to study the record in order to determine how to cast their votes on the petition for rehearing en banc. Smith v. Armontrout, No. 88–2359 (order of Lay, C.J., Heaney and McMillian, JJ., filed October 3, 1988).

A motion of the respondent to vacate this stay was denied by the Court en banc, two judges (Fagg and Magill, JJ.) dissenting, and the Supreme Court also declined to set aside the three-judge stay. Armontrout v. Smith, —— U.S. ——, 109 S.Ct. 200, 102 L.Ed.2d 170 (1988). Thus, the execution did not take place on October 4, and the stay remained in effect pending our decision on the petition for rehearing. A supplement to the petition has also been filed and considered by the Court.

We now deny the petition for rehearing en banc. A brief summary of the history of this case will suffice to explain our reasons.

The murder of Karen Roberts took place in 1980. Smith was convicted of this crime and sentenced to death in 1981. The conviction was upheld on direct appeal and on collateral review in the state courts. From time to time, Smith changed his mind about pursuing efforts to have his conviction set aside. By the time the habeas corpus petition now before us was filed in the District Court, Smith had decided he did not want to pursue his remedies. A series of next friends attempted to press them on his behalf, however, claiming that Smith was not competent, and that his decision to accept the death sentence was not voluntary. Accordingly, the District Court held an extensive and searching evidentiary hearing, including testimony from psychiatric experts on both sides of the issues. After this hearing, at which the burden of proof was placed on the State to show that Smith's decision was both competent and voluntary, the District Court found as a fact that Smith had the capacity to make his own decision, and that he had made it voluntarily. Smith v. Armontrout, 632 F.Supp. 503 (W.D.Mo.1986).

On appeal by the next friends, we affirmed. 812 F.2d 1050 (8th Cir.1987). After carefully studying[1] the entire record, we held that the District Court's findings were not clearly erroneous.[2] The next

---

1. The case was under advisement for five months.

2. The State argued that the District Court had wrongly placed the burden of proof on it. We

friends filed a petition for rehearing, with suggestions for rehearing en banc. The petition was denied. Not a single judge voted to grant it. In fact, no Member of the Court even requested a poll on the petition.[3] The Supreme Court denied certiorari. —— U.S. ——, 107 S.Ct. 3277, 97 L.Ed.2d 781 (1987). No Member of that Court indicated a desire to review the case.

In the meantime, Smith had changed his mind, apparently, in part at least, because he had gotten married. He decided to prosecute his habeas petition, and the District Court proceeded to hear and determine the merits of the petition. As we have noted, the District Court dismissed the petition on the merits. Smith then reverted to a determination to acquiesce in his sentence, and asked that the case be dropped. His court-appointed counsel, acting out of a commendable abundance of caution, filed a notice of appeal anyway, which we treated, in accordance with Fed.R.App.P. 22(b), as an application for a certificate of probable cause. Smith then wrote the Clerk of this Court to ask that the appeal be dismissed. Since we had previously affirmed his competence to make such a decision, we knew of no reason why his wish should not be granted, but, because life was at stake, we did not simply deny the application out of hand, but instead entered a show-cause order indicating our intention to do so if no good reason to the contrary could be shown. *Smith v. Armontrout*, 858 F.2d 1303 (8th Cir.1988) (per curiam).

As a result of this order, the current set of next friends entered their appearance, alleging certain facts that, they contended, required a new evidentiary hearing on Smith's competence. The following facts were alleged:

The Commission and Brummer are aware of several events in Smith's life which need to be examined at a new competency hearing to determine their effect on Smith's present "waiver" decision. The events are:

A. Gerald Smith's marriage to Lyn [sic] Smith.

B. Gerald Smith's decision to change his mind about waiving his appeals reflected in his filing of a federal habeas corpus petition in the federal District Court which is the subject of this appeal.

C. The litigation concerning Smith's federal habeas corpus petition in the District Court.

D. After the District Court's decision to deny Smith's federal habeas corpus petition, Smith's apparent decision, reflected in his September 23, 1988 letter, to change his mind again, abandon his appeals, and acquiesce in his execution.

5. Lyn [sic] Smith's recent decision to encourage her husband to abandon his appeals and acquiesce in his execution.

In the panel opinion which gave rise to the present en banc proceedings, we held these allegations legally insufficient. The Court en banc now adopts the panel opinion. We repeat, for the reasons given in that opinion, that the facts alleged by the next friends, even if fully established by evidence, do not amount, in law, to a sufficient reason to reexamine the previous finding, which is now the law of this case. Conspicuously absent are any allegations of new psychiatric examinations or new conduct by Smith, other than the facts of his marriage and his changes of mind. As we said in the panel opinion:

We think these allegations, assuming their truth for present purposes, are legally insufficient to create a genuine issue of material fact as to Smith's present mental capacity. Subparagraph C is simply a factual recitation that habeas litigation has occurred in the District Court. Subparagraphs B and D accurately state that Smith has changed his mind in the past ..., but competent people do change their minds, even about very important matters, and past changes of mind were among the arguments that we considered

found it unnecessary to decide this question. See 812 F.2d at 1058 & n. 8.

3. Under our practice, if no judge requests a poll on a petition for rehearing en banc, an order denying the petition is routinely entered.

and rejected when we considered the question of Smith's capacity last year. Subparagraphs A and E merely recount Smith's marriage and his wife's decision to encourage him to abandon his appeals. We have not heard from Mrs. Smith,[4] but we assume that the motion is accurate in this respect. Even so, no genuine issue of her husband's capacity is raised. It is not at all unnatural for someone to consult with his or her spouse about important matters and to be influenced by the spouse's advice. Nor do we have any reason to suppose that Mrs. Smith is exercising any undue influence, or that she is acting for any reason other than her own sincere belief as to her husband's best interests.

857 F.2d at 1229–30.

■ In their petition for rehearing, the next friends make the same arguments that were before the panel. In addition, they have submitted the affidavits of three psychiatrists, none of whom has ever examined Smith, but all of whom think we should order a new evidentiary hearing.[5] The affidavits are substantially similar. They opine that the new facts alleged by the next friends, allegations we have set out above, show that "a medical presumption exists that Smith has experienced a chronicity of stress factors which could provide marked psychic disorganization in Mr. Smith." Affidavit of Moisy Shopper, M.D., ¶ 7(A). In addition, Smith's marriage is said to be "a very significant psychological event" and "not an ordinary marriage" (Smith being on death row). *Id.* ¶ 7(B).

These opinions are insufficient to require a new mental examination. In the first place, they are carefully hedged and tentative. It is not said, for example, that Smith is exhibiting "marked psychic disorganization," but only that "a medical presumption exists ... which could" create such a condition. In the second place, the issue is more one of common sense and good moral judgment (fields in which the competence of judges should equal that of psychiatrists) than of medical expertise. In expressing these views we mean no disrespect or deprecation of the three physicians who have come forward to express their views. They have done so in all good faith to be of assistance to us and to the public interest in fair adjudication. We simply do not believe that their opinions come up to the required legal threshold.

It is important to remember that the issue of legal decisionmaking capacity that the next friends now urge is not before us now for the first time. We are not writing, as the phrase goes, on a clean slate. Rather, we must take the prior determination of competence as a given, a sort of benchmark, the correctness of which we are entitled to presume unless some substantial reason to the contrary appears. Any other approach would make meaningless prior determinations of mental condition, because it is always possible for a next friend, acting at the last minute, to request a new evidentiary hearing on a prisoner's competence to waive his remedies, just as it is possible for a prisoner himself, at the last minute, to request a new evidentiary hearing with respect to his own sanity for purposes of *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), which holds that the Eighth Amendment does not permit the execution of a prisoner who is "insane."

---

**4.** As the dissenting opinion of Lay, C.J., notes, *post*, p. 1512, Mrs. Smith, in an informal communication with our Clerk's office, disputes these allegations. If we thought they were legally material, we would agree that an evidentiary hearing should be held, but we do not. A claim that someone has "encouraged" another to make a decision does not even begin to raise a genuine issue of undue influence or overreaching. We note, in addition, that Mrs. Smith has now filed her own next-friend petition, attacking another death sentence imposed on her husband for another murder. *Smith v. Armontrout*, 865

F.2d 1501 (8th Cir., notice of appeal filed November 17, 1988).

**5.** The submission in a rehearing petition of material—especially factual material—that was not before the panel is extraordinary. Normally we would not consider it. In this case, however, because life is at stake and because the next friends had only a few days to prepare their presentation to the panel, we have considered the new material. We have also considered the next friends' supplemental suggestions, with exhibits, filed on November 15, 1988.

In this regard, we take our cue from the concurring opinion of Justice Powell in *Ford.* Once a finding as to mental condition has been fairly and properly made, "[t]he State ... may properly presume that petitioner remains sane at the time sentence is to be carried out, and may require a substantial threshold showing of insanity merely to trigger the hearing process." *Ford v. Wainwright, supra,* 477 U.S. at 426, 106 S.Ct. at 2611 (opinion of Powell, J., concurring in part and concurring in the judgment) (footnote omitted). This remark, made in the context of the *Ford* insanity-at-the-time-of-execution issue, is just as valid in the present context, in which the issue is a prisoner's present capacity to waive his remedies. See also *Johnson v. Cabana,* 818 F.2d 333, 339–40 (5th Cir.) (per curiam), *cert. denied,* 481 U.S. 1061, 107 S.Ct. 2207, 95 L.Ed.2d 861 (1987); *Evans v. McCotter,* 805 F.2d 1210, 1213–14 (5th Cir.1986). Language in *Johnson* is particularly apposite in the present situation. There, a psychologist concluded that the prisoner's present condition "may" impair his relations with his counsel, and the Court remarked that such a showing did "not come close to establishing that Johnson lacks a sufficient understanding to know what facts might help his case or the requisite intelligence to discuss them with his counsel." *Johnson,* 818 F.2d at 340.

It may well be that Smith suffers from one or more mental disorders. Such a showing, without more, is wholly insufficient to meet the legal standard that the Supreme Court has laid down for this kind of case. The rule of that Court is that defendants may waive their remedies if they have the capacity to appreciate their position and make a rational decision, and if they do not suffer from a mental disease, disorder, or defect that may substantially affect this capacity. See *Rees v. Peyton,* 384 U.S. 312, 314, 86 S.Ct. 1505, 1506, 16 L.Ed.2d 583 (1966) (per curiam). The statement in one of the dissenting opinions, *post,* p. 1513, that "[i]t is ... fundamental that a person ... who manifests a state of mental disorder or disease demonstrating mental instability should not be allowed to waive their legal rights" is not consistent with this standard. More than mental disorder must be shown. The disorder must be one that substantially affects the prisoner's capacity.

Both of the dissenting opinions emphasize Smith's history of mental disorder and family instability. In addition, large and selective excerpts from the testimony at the evidentiary hearing on Smith's competence are quoted. The controlling point for legal purposes, though, is this: all of this testimony was considered by the trier of fact more than two years ago, and a finding in favor of competence was made. When the three-judge stay was entered on October 3, the stay order was careful to emphasize that "[w]e do not suggest a collateral attack may be made on" the prior findings affirmed by this Court. Order of Lay, C.J., Heaney and McMillian, JJ., p. 2. It seems to us that the dissenting opinions fail to live up to this statement.

\* \* \* \* \* \*

In sum, for the reasons stated, we hold that the new allegations of fact made by the next friends, even when supplemented by the three new psychiatric affidavits, are not sufficient to raise a genuine issue of material fact requiring a new evidentiary hearing. The prior finding of competence therefore remains in effect.

The whole presupposition of the criminal law is that most people, most of the time, have free will within broad limits. They are capable of conforming their actions to the requirements of the law, and of appreciating the consequences of failing to do so. Without this fundamental moral and legal assumption, punishment, one of the principal purposes of the criminal law, would be an irrational exercise. The watchword of the law is individual responsibility. By the same token, individuals who are responsible for their acts continue to be responsible for their decisions and continue to be in charge of their own fate, to the extent permitted by law. If someone decides that he or she prefers to acquiesce in a presumptively lawful judgment of a court, this decision should be respected, unless that person's mental condition is so abnormal

that it does not meet accepted legal requirements. Mr. Smith decided to commit murder in the first place. He has now decided to suffer the consequences of this action. We believe the law allows him to make this decision.

Accordingly, the petition for rehearing en banc is denied, and the petition for rehearing by the panel is also denied. The stay of execution previously entered by three individual circuit judges is hereby dissolved. We direct that our mandate issue forthwith.

It is so ordered.[6]

LAY, Chief Judge, with whom HEANEY and McMILLIAN, Circuit Judges, join, dissenting.

The sole issue involved in this petition is whether or not the district court should be required to hold an evidentiary hearing to determine whether Gerald Smith is legally competent at the present time to make a decision to abandon his appeal from the denial of his petition for a writ of habeas corpus entered by the district court on August 11, 1988. Smith is under sentence of death for capital murder. His sentence was scheduled to be carried out according to the order of the Supreme Court of Missouri on October 4, 1988.

A panel of this court, on September 29, 1988, refused to stay the execution of Smith on the basis that Smith himself has written to this court stating that he does not wish to pursue an appeal of the denial of his petition for a writ of habeas corpus; that he wants the appeal dismissed; and that he wants the sentence carried out without further review. The Missouri Public Defenders Commission and the Director of the State Public Defender filed a petition for a rehearing by the panel with the suggestion for rehearing en banc. On October 3, 1988, three judges of this court, myself, Judge Heaney and Judge McMillian, entered an order staying the execution pending our study of the record and the petition for rehearing en banc.

There can be little question that the petition for habeas corpus filed by Smith's appointed counsel in the federal district court states substantial issues concerning the validity of Smith's death sentence. There is little question that this court would grant a certificate of probable cause to allow the appeal to proceed on the grounds that the petition for writ of habeas corpus contains several arguable issues that would, if decided favorably to Smith, invalidate his death sentence rendered by the state court. Included in this challenge are substantial issues relating to alleged ineffective assistance of counsel Smith received during the trial, the constitutionality of the Missouri death penalty statute and death penalty proceedings, the constitutionality of the petit jury that rendered the death penalty, and the denial of due process in the trial itself. It is clear that this court would grant a certificate of probable cause for Smith to proceed to challenge the denial of the writ of habeas corpus and that the only issue now before us is whether Smith is competent to waive these rights and whether undue influence has been exercised on Smith in his weakened mental condition to cause Smith to waive these rights. We note this is the first and only appeal that has ever been filed on behalf of Smith in this habeas corpus proceeding.

The panel's opinion relies upon the federal district court's determination that Smith was competent and capable of making a rational decision. This decision was entered by the district court on April 5, 1986, and that determination was affirmed by the court in *Smith v. Armontrout*, 812 F.2d 1050 (8th Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 3277, 97 L.Ed.2d 781 (1987). The panel found that the district court's finding continued to be controlling and that there

---

6. The possibility always exists that Mr. Smith may change his mind again. We direct the respondent Armontrout to deliver to Mr. Smith in person a copy of this opinion. If Mr. Smith changes his mind again, we direct the respondent Armontrout to inform the Clerk of this Court at once. The writer of this opinion believes that Smith's petition for habeas corpus, considered on its merits, is not frivolous. If Smith changes his mind about pursuing his remedies, it is my intention to grant a certificate of probable cause and issue a stay of execution, pending determination by this Court of the appeal on its merits.

was no evidence or reason suggesting that Smith's mental condition has materially changed for the worse in the intervening time.

I would respectfully disagree with that finding. The determination by the district court was made some two and one-half years ago. Examination of that record reveals that there was substantial disparity between the psychiatric expert witnesses testifying for the state and the psychiatric expert witnesses produced by Smith. Furthermore, the Missouri Public Defender Commission's petition for rehearing en banc contains affidavits of three psychiatrists who have given their opinion, within a reasonable degree of medical and psychiatric certainty, that based upon intervening events the evaluation of Smith that took place during the hearing in February, 1986, should not be used as the dispositive determination of Smith's present mental condition to determine whether Smith is free from mental disease and defect and therefore capable of being executed under laws of Missouri and the Constitution of the United States.[1]

At the time that the state court first held a competency hearing to determine whether Smith was capable to waive the appeal of his death sentence and was legally competent to be executed in 1983, it is revealed in the petition for habeas corpus that pursuant to the statute in the State of Missouri, the warden of the Missouri Penitentiary in 1983 sought psychiatric opinions of three different psychiatrists. At the hearing before the St. Louis Circuit Court in 1983, the state produced only one of those psychiatric examinations, that being the expert opinion of Dr. Pettipiece. Not produced at the state court hearing and not disclosed to Smith's trial counsel at that time were two other psychiatric reports, one being Dr. Daniel's report dated June 13, 1983, who at that time was a staff psychiatrist at the Mid–Missouri Mental Health Center at the University of Missouri School of Medicine, and the other being Dr. Bruce Harry's report dated June 10, 1983, who was Assistant Professor of Psychiatry at the University of Missouri at Columbia. Both of these doctors would have testified that Smith was not competent to be executed in 1983. Yet these reports were not disclosed to the state court.

These reports were later discovered by Smith's trial counsel and were produced for expert witness to review at the competency hearing in 1986. The relevancy of the nondisclosure of these reports casts continued doubt regarding the full disclosure by the state as to Smith's competency at the present time. It is clear that Smith has not ever had a valid competency hearing in the state court. But of equal significance is the revealing testimony of the state's psychiatric and psychological experts who, while finding Smith to be competent at the 1986 hearing, were willing to concede that Smith did suffer from a mental disorder and that depending on the time, place, and circumstances under which Smith was examined, Smith's mental stability fluctuated from various degrees of competency to severe degrees of depression and instability. For example, Dr. Clayton Pettipiece, psychiatrist at the United States Medical Center for Federal Prisoners in Springfield, Missouri, who had observed Smith in states of great depression, commented on what he considered Smith's improved condition in early 1986:

Q. Now, in December of 1984, did Mr. Smith indicate to you that he was depressed?

A. No sir.

Q. Not at all?

A. He never talked about being depressed, no.

Q. But in your report you state—in the report you recently prepared dated February 13, you state: "Affect and Mood: Patient's affect was appropriate at all

---

1. In effect three judges have appraised the intervening events alleged, and have held as a matter of law these cannot change the legal determination of Smith's competency found two and one-half years ago. Yet three distinguished psychiatrists, with their distinguished vitae attached to their opinion, have filed sworn statements that such events within a reasonable degree of medical and psychiatric certainty could have a material bearing on whether Smith is still competent to make a rational and competent decision.

times. His mood was no longer despondent nor did he indicate any depression as he has previously." Now, that seems to indicate that at one time he did tell you he was depressed.

A. He didn't tell me he was depressed. He was in a better mood than he was previously so obviously he's in a better mood at this time than he was previously.

Q. But you say in there that he did not indicate any depression as he had previously.

A. He did not indicate any—he never did tell me that he was depressed.

Q. Why did you use that particular phraseology that he did not indicate this time any depression where he had previously?

A. I guess I just don't know how to use good English all the time. It's just a poor sentence structure maybe.

Q. Well, how would you compose that sentence if you could recompose it?

A. I'd have to look at it and see.

Q. What would you want to say in that sentence?

A. I simply would like to say that he's not as depressed—he feels better than he did on the time when we saw him previously.

Q. And you said that one of the results of a personality disorder like Mr. Smith has is that he's unable to delay gratification.

A. That's—

Q. He's impatient.

A. That's true.

Q. He's impulsive.

A. I believe Mr. Smith has been impulsive in the past.

Q. And is that because he can't tolerate the anxiety of delayed gratification?

A. I don't know why, it's just that that's the way he does.

Q. Is Mr. Smith able to deal with his anxieties?

A. To some extent.

Q. Does he have a history of dealing with his anxieties in anything other than violent outbursts, suicide attempts?

A. Sure.

Q. And what is that history?

A. I'm sure he's anxious right now and he's not violent, he's not outbursting, he's not attempting suicide.

Competency Hrg. Transcript at 2–69 to –71.

Dr. David V. Foster, a psychologist at the facility in Springfield, while diagnosing Smith as competent, admitted that this issue was "hazy" and he was not certain of his position:

Now, a problem there for me is on the rational side. In the past some courts have interpreted that as an affective component that's a lot more subjective. It could vary. If you had five different professionals sitting up here that could give you five different answers because it would be a professional opinion but it would be a very subjective professional opinion. On that level again in my determination, Mr. Smith is competent. Okay. But it's a hazey [sic] area, it's a fuzzy area. I'm not sure that person who is facing death, who is condemned to die, who experiences hopelessness anyway, who does have some lack in social skills, in terms of coping skills, I'm not sure that that allows a person to be "fully rational." I don't know what the standard is or what the ideal is there. That's a gray area for me.

*Id.* at 2–118. Dr. Foster also noted a long history of severe depression as well as "self-damaging impulsity" and a "pattern of intense and unstable inter-personal relationships." *Id.* at 2–114:

I'm not completely convinced given say for instance the borderline characteristics that Mr. Smith has, I'm not completely convinced how robust his capacity is as far as to make a rational decision in a number of areas. His impulsivity and potential for self destruction are clearly documented.

\*   \*   \*   \*   \*   \*

[H]e's also aware of the ups and downs and the potential length of time that the whole appellate procedure can be stretched out, even here in the federal courts. He's cognitively aware. I don't know how emotionally aware he really is.

*Id.* at 2–120 to –121. As for the possibility of Smith's susceptibility to undue influence, Dr. Foster stated:

A. In my opinion emotional pains are more severe than physical pains and in my opinion, yes, he does fear—with the people he's already close with he doesn't want to cause any more pain to himself or to them and to me it would make sense that one way he would do that is just to avoid the whole arena, tell them just leave me alone. That would be easier for him than the ongoing and periodic pain that he has no outlet for.

Q. Now in this ongoing and periodic pain I also assume that there may be some concern on Mr. Smith's behalf that they might change his mind.

A. That's feasible.

Q. And you know that that's happened in the past.

A. He has changed his mind. I'm not going to—in my opinion Mr. Smith is responsible for that change. [H]e's changed his mind. They might have greatly influenced it.

\* \* \* \* \* \*

Q. And if you wanted to be destructive, would Mr. Smith be amenable to that kind of influence?

A. There's that potential based on the quality of the relationship. I think he is influenceable as I think most people are, perhaps more influenceable than the average person, by a select few.

\* \* \* \* \* \*

A. I only said it could be consistent with some of my perception and interpretation of Mr. Smith's behavior. I think that one of the things that Mr. Smith fears, as I said, is pain and the deepest kind of pain isn't physical pain that he fears as much as emotional pain. I think it pains him to argue, to change his mind, to have them begging him perhaps to continue seeking to live, to continue seeking a quality of life and a length of life in so long as that's in his power. I think for him that is painful. It's painful to say no to them. It's painful to be consistently reminded of those issues when he keeps swaying back and forth. I

think he is attempting to escape the conditions there, not just the death row physical conditions, I'm talking [abo]ut the psychological and emotional climate as well. Death appears an option out for him.

Q. Is it your opinion or from your conversations with Mr. Smith that someone is attempting to influence Mr. Smith not to pursue his appeals.

A. That's my conjecture.

*Id.* at 2–142, 2–144, 2–168.

Dr. Sadashiv Parwatikar, whose deposition was taken February 10, 1986, is a psychiatrist and an associate clinical professor at the University of Missouri, in Columbia. Dr. Parwatikar initially examined Smith in the early 1980's:

A. My diagnosis at that time was he continued to have the borderline personality, but he was also suffering from mild depression.

Q. And could you give us the basis for that finding?

A. Mr. Smith, at this time, had changed his story and had stated to me that he indeed had killed this woman, and that he was—there's—there's no sense in living any further because he had a small child, and he did not want—want the small child to grow up knowing that he was a murderer, and that he wanted to get the death penalty because he did not want to live, and basically he had sort of lost hope with—with this case, and I felt that this was again a function of his borderline personality because borderline persons, can become depressed, and can become rather impulsive to the point that they sometimes don't know what they're trying to do \* \* \*.

Parwatikar's Dep. at 10. "[P]eople can change from—from month to month, year to year, but since I have seen him for four years, I believe that this man is borderline at—and at any given time, he could become impulsive, and become dangerous to himself, or others." *Id.* at 21. Finally, Dr. Parwatikar summed up the typical conduct of an individual such as Smith:

Q. Okay. Now, you said that—that one of the primary motivators, in terms of Mr. Smith's character disorder, is that he has to have his own way?

A. That's right.

Q. Okay. That would be somewhat similar to how a child sometimes reacts, when they don't get their own way?

A. That's correct.

Q. And that the impulsive behavior is often, if he doesn't get his own way, he's going to show you by doing something impulsive?

A. That's correct.

Q. That may be dropping his appeals because he feels his family hasn't paid enough attention to him, it may be hitting someone over the head because he's mad [at] someone else?

A. That's right.

Q. Okay. So that that kind of impulsive behavior, is very consistent with the characterological disorder that you found in Mr. Smith?

A. That's correct.

            *     *     *     *     *     *

Q. * * * because he was a borderline personality disorder, he may or may not be acting on some—based on some psychosis?

A. That's correct.

Q. And that a—it was appropriate to do another examination, or evaluation, to determine what was the basis for his decision, if any?

A. That's correct.

Q. Okay. And in that particular document, you also indicated on Page 2, that psychological testing during the examination indicated that Mr. Smith's ability to exercise rational judgement [sic] in practical situations, was in the mentally handicapped range, which would serious[ly] affect his decision making under stressful situations?

A. That's correct.

Q. Okay. And I assume that living on death row itself, from what you—at least you understand it, obviously is a—is a stressful situation?

A. Yes, sir.

*Id.* at 33, 41–42.

Finally, Dr. Z.A. Ajans is a psychiatrist who is on the University of Missouri faculty and consultant to the state's department of corrections. In his first visit, Dr. Ajans observed Smith in a severe state of depression. His next visit showed Smith much improved but Dr. Ajans nonetheless acknowledged his long history of unstable and self-destructive tendencies. Regarding Smith's many attempts at suicide, Dr. Ajans stated:

A. * * * He'd had a total of five, three before his incarceration and two since his incarceration. I could not make any judgments about the nature of the suicide attempts before his incarceration but he gave me the impression that the ones since his incarceration were not genuine suicide attempts and I believed him.

Q. Okay. Now when you interviewed Mr. Smith you indicated that he oftentimes tries to tell you what he thinks you want to hear, the audience wants to hear.

A. Yes.

Q. And that would be true?

A. Especially, as I said, I think there was a definite change in attitude and his willingness and degree of cooperation. I felt that that was true more so during the 1984 examination than the 1986 examination.

Q. Okay. And at that time you said he appeared insecure and inadequate?

A. Yes, he has.

Q. Do you feel that he is no longer insecure?

A. I'm sure he was—part of the personality disorder we're talking about there are—even though they act tough and they're very hostile and aggressive, there are always feelings of insecurities in these people, so to that extent, yes, it's correct even now.

Q. Would a borderline personality disorder necessarily improve or his condition improve with time?

A. Borderline personality disorders manifest—their symptomatology becomes worse during stressful situations.

But the basic personality makeup, the tendencies are unchanged.

Q. Okay. And they wouldn't change with treatment or otherwise?

A. No, the basic tendencies.

Q. So that the borderline personality disorder that you found which was found by almost every psychiatrist who has dealt with him, would still exist.

A. That's correct.

Q. And you don't think that it's gone?

A. I'm sorry.

Q. You don't think that it's dissipated or lessened in any way.

A. No sir.

Q. So then—

A. Other psychiatrists may disagree with me though, I mean, it's just a matter of opinion regarding this examination but it's my opinion that he did demonstrate the findings that were compatible with those personality disorders.

Q. Is his background one of inconsistency?

A. Inconsistency?

Q. Inconsistency.

A. Yes.

Q. Is his background one of erratic judgments?

A. Yes sir.

Q. Would you say that his ability to make judgments is influenced considerably by his personality disorders?

A. Yes sir.

Q. All right. And so that those mental disorders that you're referring to would influence his ability to make judgments.

A. Yes sir.

Competency Hrg. Transcript at 2–195 to –197. Smith's mental condition, according to Dr. Ajans, could have a substantial influence over his decision making powers:

Q. Now in the response to Ms. Mescher's question you said that a personality disorder would interfere with someone's judgment making capabilities, is that correct?

A. Judgment?

Q. Yes.

A. Yes sir.

Q. And when you say "interfere" I assume you also mean it would affect it.

A. Yes sir.

Q. And could affect it substantially.

A. Yes sir.

*Id.* at 2–211 to –212.

Smith has now filed an affidavit with this court asserting that he is competent to make his choice and that he now chooses to die. Smith is resentful of the Missouri Public Defender Commission and the judges of this court who seek another competency hearing. This affidavit is compatible with Smith's declaration made over the past several years at the times when he wished to dismiss his appeal. It is inconsistent with the various occasions where he has changed his mind and has sought to make further challenge and attack upon the validity of his sentence. Over the course of time since Smith was sentenced to be executed, Smith has changed his mind on at least ten occasions as to whether or not he would challenge the state death sentence.

The clerk's office has received reports from Smith's wife stating that she has not exercised undue influence. The clerk's office has also received a report allegedly made by a Deputy Attorney General of the State of Missouri that Smith's wife has a contract to publish a story about Smith's life when he is executed. These factors are not in the record but simply illustrate the need for further evidentiary exploration as to what influences have been injected in Smith's alleged exercise of free will in dismissing his appeal.

Smith has been convicted in the state court of first degree murder. A competency hearing was thereafter held which was incomplete and which did not disclose all of the exculpatory information concerning Smith's competency in the state proceedings. Three years later, in 1986, the federal court determined Smith was competent to waive his rights to appeal. This was two and one-half years ago, and now Smith has once again decided to abandon his appeal. A person of mental instability may be subject to all kinds of psychological stress and undue influence such that this

person can be easily influenced to make decisions which are not done of one's own free will. It is fundamental that no person should be executed at the hands of the state unless they have been afforded due process of law and effective representation by counsel. Furthermore, a person who is not legally competent must not be executed. It is equally fundamental that a person who is not legally competent to exercise their free will in making a rational decision or who manifests a state of mental disorder or disease demonstrating mental instability should not be allowed to waive their legal rights; such a person cannot be allowed to waive the right to live or exercise the right to die.

Under these circumstances, in my judgment, it is and would be a denial of due process of law to dismiss Smith's appeal without a further determination of Smith's mental competency to exercise his own free will.

HEANEY, Circuit Judge, with whom LAY, Chief Judge, and McMILLIAN, Circuit Judge, join, dissenting.

I write separately to outline Gerald Smith's personal history, because I believe that his personal history supports the view that Smith's mental health is a progressive and changing condition requiring that a current evidentiary hearing be held to determine his present competency to dismiss his appeal.

The experts who examined Gerald Smith are in general agreement that Smith suffers from a borderline personality disorder, from an anti-social personality disorder, and from a history of depression. (The term "borderline" means that Smith sits on the border between psychotic and intensely anxious behavior, out of control anger and the opposite.) The experts are also in general agreement that each of the above are "mental disorders" within the meaning of *Rees v. Peyton*, 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966).

The record moreover makes it clear that Smith has suffered from these disorders during most of his thirty years. As a young child, Smith sustained several serious head injuries. When he was less than two years old, he was admitted to the St. Louis City Hospital with lead poisoning. The lead level in his body was dangerously high. He was thrown out of school in the first grade for fighting. At age 10, he became a petty thief. At age 15, Smith was sent to the Missouri Hills Home for Boys, a juvenile detention facility. Throughout Smith's childhood his father drank excessively and beat Smith frequently.

Smith dropped out of school after completing the eighth grade and has had no significant period of employment since dropping out. He has abused alcohol and marijuana since age 13 and has abused amphetamines, demoril, placedil and valium on a regular basis for a number of years. Smith has a history of being unable to maintain enduring relationships, although he has had many sexual partners.

Smith has a long history of being unable to control his anger, causing him to act impulsively. Smith has a history of physically hurting himself, implicating suicidal tendencies. He has cut his forearm 83 times, he has slashed his wrist three times, and he has overdosed on several occasions. He has attempted suicide five times: three times before incarceration, and twice thereafter.

Smith was arrested on eight occasions between September, 1979, and August, 1980. He was admitted to the Alexian Brothers Hospital in St. Louis in 1980 after he threatened to commit suicide by jumping off a three-story building. Smith was then diagnosed as suffering from depression and personality disorder. One examiner noted that Smith's "chronic obsessive thinking of hostile threats and activity is a problem of mammoth proportions." Another stated that Smith was a total catastrophe. He was nonetheless released from the hospital shortly before he killed Karen Roberts.

All of the psychiatrists who have examined Smith indicate that he has frequent mood changes and conclude that persons who have a personality disorder such as Smith are prone to act impulsively, to be

self-destructive, to act out of extreme anger without a sense of what is going to happen in the long run, to be in need of immediate gratification, and to have difficulty in dealing with other people.

Under the circumstances outlined above and in Chief Judge Lay's dissent, I believe that an evidentiary hearing relating to Smith's current competency should be held before his appeal is dismissed.