In the

# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 04-3549, 06-2905

ERIC D. HOLMES,

*Petitioner-Appellant*,

*v.*

EDWIN G. BUSS,

*Respondent-Appellee*.

———————

Appeals from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
Nos. IP 00-1477-C-M/L, 1:05-CV-1763-LJM-WTL—
**Larry J. McKinney**, *Chief Judge*.

———————

ARGUED OCTOBER 11, 2007—DECIDED OCTOBER 30, 2007

———————

Before POSNER, FLAUM, and WOOD, *Circuit Judges*.

POSNER, *Circuit Judge*. In 1992 the petitioner, originally named Eric Holmes but now going by the name Koor An Nur of Katie Mary Brown, was convicted of a pair of murders committed three years earlier, and in 1993 he was sentenced to death. After exhausting his state remedies, he filed the first of the two petitions for federal habeas corpus that are before us (only the first need be discussed, as will become apparent). One of the issues he raised was whether he was competent to assist his lawyer in the habeas corpus proceeding. The district judge, re-

fusing to provide funds to enable the petitioner to hire a psychologist or psychiatrist who would give evidence concerning the petitioner's mental condition, ruled in 2003 (after questioning the petitioner in an effort to form a judgment about his competence) that he was competent, and in the following year denied habeas corpus relief. The petitioner appealed, and in August 2005, before taking up any other issues presented by the appeal, we ordered a limited remand to the district court to determine the petitioner's competence to proceed with the appeal, in light of affidavits presented by his counsel suggesting that his mental condition had deteriorated since the April 2003 hearing. We suggested that the judge, on remand, consult experts, and he did so. He received and considered reports from two experts, one hired by the state (Dr. Dan A. Olive), the other by the petitioner (Dr. Rahn K. Bailey). And he again questioned the petitioner; but he denied the petitioner's request that Dr. Olive, whose report was equivocal, be made available for cross-examination. The appeals in this court then resumed, with the parties filing new briefs that repeated the original appellate briefing on all issues except the petitioner's competence, concerning which his lawyer asks for a further hearing in the district court to enable him to cross-examine Dr. Olive, the state's expert.

As a matter of first impression, we might doubt the legal significance of a person's lacking the mental competence to prosecute, or to assist his lawyer in prosecuting, a federal habeas corpus proceeding. Technically, habeas corpus is a civil proceeding rather than a criminal one. Realistically, it is a stage in the criminal process, but it is a stage initiated by the criminal defendant rather than by the state; and it is odd to think that someone who

initiates a proceeding can then freeze it by claiming to be mentally incompetent. An incompetent person can of course have a legal claim, and it will be prosecuted by his guardian or (in the antiquated legal phrase) his "next friend," but the fact of his incompetence will not be allowed to interrupt or delay the proceeding. See the helpful discussion in *O.K. v. Bush*, 344 F. Supp. 2d 44, 55-57, n. 14 (D.D.C. 2004).

But in *Rohan ex rel. Gates v. Woodford*, 334 F.3d 803 (9th Cir. 2003), the Ninth Circuit, in an exhaustive opinion by Judge Kozinski, held that in a capital case a petitioner for federal habeas corpus must be competent to assist his counsel; if not, the proceeding must be stayed. Judge Kozinski relied in part on a federal statute, 21 U.S.C. § 848(q)(4)(B), entitling a federal habeas corpus petitioner to counsel in a capital case, and the statute was recently repealed—but it was promptly replaced by a materially identical statute. 18 U.S.C. § 3599. Anyway, his opinion places greater emphasis on other factors, such as that a waiver of a legal right (concretely, the right to seek postconviction relief) must, to be effective, be knowing, implying mental competence. See also *Mata v. Johnson*, 210 F.3d 324, 329 (5th Cir. 2000). And really the presence or absence of counsel is a detail. If the petitioner doesn't have counsel, the issue is his competence to proceed without assistance of counsel. If he does have counsel, the issue is his competence to provide such assistance to counsel as is necessary to enable the claim to habeas corpus relief to be prosecuted adequately by his counsel.

But whether *Rohan* is right or wrong, we are not disposed to reject it, thereby creating an intercircuit conflict, when the State of Indiana has declined to challenge

it and as a result its validity has throughout these proceedings been assumed rather than litigated.

The most common claim of incompetence to participate in a proceeding is a criminal defendant's claim that he is incompetent to stand trial—that because he is retarded or insane he cannot understand the proceeding sufficiently to assist in his defense. If he prevails in his claim, he avoids a conviction. But once he has been convicted and imprisoned and seeks postconviction relief, he usually has little to gain by claiming that he is incompetent to conduct the postconviction proceeding or, if he has the assistance of a lawyer, to assist in the lawyer's conduct of the proceeding. For if the proceeding is halted by a finding that he is incompetent, he just languishes in prison. So we are not surprised to have found no noncapital case in which such a claim has been made. But of course in a capital case the petitioner may prefer to languish in prison than to see his claims for postconviction relief denied, opening the way to his execution, though this is provided that his execution would be stayed until and unless his postconviction proceeding could be completed.

Another reason that challenges to competence to conduct postconviction proceedings are so rare is that the petitioner has a tougher row to hoe than when he is challenging his competence to stand trial. The briefs in this case duel over the proper standard for assessing incompetence in post-trial proceedings, including appeals (including these appeals—appeals from denial of postconviction relief). The state argues that it should be a higher standard because the client's role in assisting his lawyer in a postconviction proceeding is more limited than if he is on trial. The petitioner argues that the standard should be the same. No cases address the issue.

We do not think that creating different standards to govern the issue of competence to litigate or assist in litigation (as distinct from the competence that a defendant must be shown to have in order for him to be convicted of a crime or to be executed, see, e.g., *Panetti v. Quarterman*, 127 S. Ct. 2842 (2007); *Ford v. Wainwright*, 477 U.S. 399 (1986)) is a fruitful approach. The multiplication of rules and standards, carrying in its train as it does endless debate over boundaries, is one of the banes of the American legal system, a source of its appalling complexity. Whatever the nature of the proceeding, the test should be whether the defendant (petitioner, appellant, etc.) is competent to play whatever role in relation to his case is necessary to enable it to be adequately presented.

The test is unitary but its application will depend on the circumstances. They include not only the litigant's particular mental condition but also the nature of the decision that he must be competent to make. If as in *Rees v. Peyton*, 384 U.S. 312, 312-14 (1966) (per curiam), the question is whether a petitioner for habeas corpus who has been sentenced to death is competent to withdraw a petition for certiorari filed on his behalf challenging the denial of habeas corpus (see also *Mata v. Johnson*, *supra*, 210 F.3d at 329-31), the answer is unlikely to require that he understand more than that the withdrawal of his petition will almost certainly terminate any legal challenge to his death sentence. Or suppose the proceeding is an appeal and the only nonfrivolous issue that could be raised turns on an esoteric legal point, incomprehensible to even a highly intelligent, perfectly sane defendant, that if accepted by the appellate court will terminate all proceedings against him. Assume further that his lawyer is appointed rather than retained. Then all the

mental capacity his client would need in order to be able to assist in the appeal would be the capacity to make a rational decision whether to take an appeal that has no downside. If instead, as is common, the issue for appeal is whether there was error at sentencing and if the appeal is successful the case will be remanded for resentencing and the judge may give the defendant a heavier sentence than the one appealed from, the defendant will need a higher level of mental functioning to be able to make a rational decision whether to pursue or forgo the appeal.

Federal habeas corpus happens to be one of the most complex areas of American law. With respect to many of the issues that arise in habeas corpus cases, a lay person has nothing to contribute to his lawyer's strategy. But it can be different with respect to other issues, several presented in this case, notably prosecutorial misconduct at trial and ineffective assistance by trial counsel. The petitioner was at his trial; his current lawyers were not. He may—if mentally competent—be able to convey to his lawyers a better sense of the alleged misbehavior of the prosecutor and of defense counsel than the trial transcript and other documentation provide. It is true that our remand order required only a ruling on the petitioner's competence to appeal from the denial by the district court of the relief he sought by petitioning for habeas corpus. But the appeal also challenges his competence to have proceeded in the district court; and to minimize the further protraction of the case, we think it best to consider the issues together.

The district judge thought back in April 2003 that he could determine the petitioner's mental competence just by questioning him. He didn't think he needed to take

any psychological evidence. Taking the hint in our re-
mand order, however, he commissioned expert reports;
but he seems to have given little weight to them and to
have relied again on his questioning of the petitioner, in
a hearing that the judge conducted on December 1, 2005.
It is easy to see why the judge found the expert re-
ports unsatisfactory. Dr. Bailey, the petitioner's expert, a
psychiatrist, while emphatic that the petitioner is schizo-
phrenic, paranoid, and manic-depressive, seems to have
confused a habeas corpus proceeding with a trial, because
he said that the petitioner was incompetent to (among
other things) "identify pertinent witnesses," "testify in
his own defense," "refrain from irrational actions in
court," and "tolerate the predictable stress of his impend-
ing trial." Federal habeas corpus is usually and was here
based on the record of the criminal proceeding against
the petitioner, and only in rare cases is the district court
required to conduct its own evidentiary hearing. 28 U.S.C.
§ 2254 (e)(2); *Ford v. Ahitow*, 104 F.3d 926, 928 (7th Cir.
1997). The fault, however, was not that of Bailey but that
of the lawyer who hired him and evidently instructed
him to evaluate the petitioner's competence to stand trial.
And despite this misstep, Bailey's examination of the
petitioner was thorough (it lasted five hours, and in
addition Bailey reviewed hundreds of pages of medical
records and the transcripts of both of the hearings at
which the petitioner testified), and presents a prima
facie case that the petitioner is incompetent to assist in
the conduct of the habeas corpus proceeding.

Dr. Olive, the state's witness, a psychologist, initially
declined, in a brief letter to the judge, to offer an opinion
on the petitioner's competence. In his interview of the
petitioner it had taken Olive two hours to extract basic

background information because of the petitioner's "rather circumlocutory, rapid-fire style of communication." When Olive then tried to encourage him "to discuss some of the alleged psychiatric symptomology, e.g., persecutory delusions and auditory/visual hallucinations, he informed me that he no longer wished to participate in the evaluation." Olive found himself "unable to perform a formal mental status examination or complete psychological testing that may have provided useful data regarding mental disease or mental defect, the likelihood of malingering, etc.," although he thought malingering a "strong possibility." "Unfortunately," Olive concluded, "based upon the aforementioned lack of cooperation, I simply am unable to offer an opinion regarding mental disease and, therefore, whether [the petitioner] has sufficient understanding of his legal position and the options available to him. On a more speculative level, given the fact that this particular competency test focuses more specifically on cognitive processes, i.e., rational decision-making, I am not thoroughly convinced that any psychiatric symptoms that [he] may be currently experiencing significantly compromise such capabilities. Again, based on insufficient clinical data, my impressions of [him] are necessarily speculative."

After reading the transcript of the December 1 hearing, however, Olive wrote the judge a second letter, similar to the first but more favorable to the state. For in it he said that the petitioner's schizoid and paranoid symptoms do "not appear to compromise the particular competencies currently at issue . . . . I am of the opinion that he does have the capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation. As was stated in the orig-

inal communication [Olive's first letter, from which we quoted in the preceding paragraph], this opinion is based on significantly limited data." It is unclear how much of the extensive documentary material bearing on the petitioner's competence Dr. Olive reviewed, other than the transcript of the December 1 hearing.

The district judge, while referring to the experts in footnotes and even accepting Bailey's conclusion that the petitioner is a paranoid schizophrenic, based his judgment that the petitioner is nevertheless competent to assist his attorney in the appellate phase of habeas corpus proceedings on what the petitioner said at the hearing.

Were the petitioner content to have the issue of his competence decided on the basis of the record compiled to date, the judge's ruling might well be sustainable, although we do not have to decide that. The petitioner's lawyer is incorrect in arguing that mental competence is an issue exclusively for psychiatrists and psychologists to opine on, not a legal issue for judges to opine on. The psychiatrist or psychologist is the expert on mental capabilities, but the judge is the expert on what mental capabilities the litigant needs in order to be able to assist in the conduct of the litigation, and so there are cases in which the district judge may properly find that a criminal defendant was competent even though the experts on mental functioning disagree with him. E.g., *Matheney v. Anderson*, 377 F.3d 740, 748-49 (7th Cir. 2004); *United States v. Bennett*, 908 F.2d 189, 195 (7th Cir. 1990).

But the record is equivocal, leaving us perplexed as to why the petitioner's lawyer was not permitted to cross-examine Dr. Olive. That cross-examination, plus any redirect examination, might not have extended the hear-

ing by more than an hour. One might have thought that the judge would have wanted Dr. Bailey questioned as well, to see how far his opinion might have been distorted by his misunderstanding of the procedural setting. Both reports left matters hanging in the air that could have been brought down to earth at little cost in time. Notice how Dr. Olive, in his revised report, said only that he thought the petitioner competent to decide whether to continue or abandon his habeas corpus proceeding, a decision requiring less mentation than prosecuting the case or assisting a lawyer in prosecuting it.

We cannot agree with the state that the transcript of the December 1 hearing, taken together with the equivocal expert reports, so plainly demonstrates the petitioner's competence that the district judge was entitled to truncate the hearing by denying the petitioner's counsel an opportunity to cross-examine Dr. Olive. There are lucid intervals in the petitioner's responses to the judge's questions, but there are also wild and whirling words, which the judge seems to have ignored. We give a few examples: "But you and I know a name means everything because you remember you asked me what the meaning of Koor An Nur was. I wanted to effect it was a dying man that was inherited by a royal family, Queen of England, but I never did mention that Koor An Nur the 93rd law. If you choose to call me by Katie Brown, last name of my mother, Brown, I'm more than satisfied with that." The petitioner told the judge that he had stopped reading documents relating to his case because "I feel that somehow individuals are using spirits on me to sit around and read what I read . . . . I don't have to do anything in life really anymore once I start getting attacked by spirits. I can shut everything down and just

lay in my bed at a particular angle taught in the Holy Quran and hide the sun."

He seemed obsessed with the fact that the state had at one point moved to dismiss the charges against him, though it had later moved to withdraw the motion, and the motion was never granted. "Once we get by the Federal Court the next step, which is called the 7th Circuit, is not really an appeal, it is an argument. And that argument is kind of like two individuals arguing it happened, it didn't happen, whereas a federal judge, you can sit and say right here, you know, he signed this signature. And every day I have like them over there, them prosecutors and this attorney here, they have to put their name on a document to you unless you are not going to find it to be credible, because the first thing you are looking for is that signature. So when that prosecutor signed his signature on that matter [presumably the motion to dismiss] saying it was true everybody just—seemed like every court, the post conviction court, the Indiana Supreme Court, and then I got to you, and everybody seemed to say that, well, I don't see that signature, I don't see what happening on that document . . . . So once he signed that signature it is my belief that he believed what was entitled in the above information structure. So it is handwriting which is in pen, you know. If I forge a document, you know, not only should I receive the death penalty at that point, but, you know, maybe my hand should be cut off for that, as well."

When asked about his discussions with his lawyers, the the petitioner said: "So what me and my attorney, we just didn't have a prescription, if you would, a metaphor, or what I'm trying to express is that we just didn't have the medicine between us to bring into balance because

I was looking only at, hey, man, I'm sitting here with illegal charges, and he may tell me . . . well, that issue, I understand what you are saying, but you still got to have more because that issue fails. You will go to the grave. And once we go beyond that, to me it is like I don't know what to say about those issues because I don't see how we can get to—I just don't understand how we can go any further without us establishing that, wait a minute, how we have a hearing knowing that this injustice may be occurring . . . you know, fundamentally you cannot even ask me a question until it is established that charges are existing properly . . . . So, basically, I'm saying there is no charges and so I don't understand the question . . . . So, you know, in this place I'm sitting right now, I'm getting what I asked for, which is a hearing to argue there are no charges in my case."

Obsessed with the issue of the (he thinks) dismissed charges, the petitioner seemed unable to focus on any other issues. Although when asked by the judge whether he was willing to discuss other theories with his lawyers he said "yes," when then asked whether he considered himself "competent to help them to continue this prosecution of this case" he launched into a diatribe about the supposed dismissed charges: "I'm only as competent as the knowledge to know that . . . there are no valid charges against me in my case."

He did say he wasn't hearing voices "right now," but that turned out to be the introduction to a long ramble about how "my mental state is that I'm careful because I never know who I'm talking to because, as the Quran teaches, that I have been talking about the jinn being, the invisible force . . . . I never know who I'm talking to anymore because they [the jinn beings] could manifest and

beat me up . . . . They are in the cell with me. I see like a little midget looking, a couple of them, one white and one black. The little black one just beat me up, and I wanted to throw some punches, but it is kind of like a force field . . . . Even at the apex of their anger they always come back because you levitate. You know, because you levitate, and that is something they interested in."

There is a further problem with the district judge's ruling. In support of the motion to remand, the petitioner's lawyer had referred us to evidence that his client's mental condition had deteriorated since the April 2003 hearing. So one might have expected the district judge on remand to compare the petitioner's testimony at the new hearing with the transcript of his testimony at the 2003 hearing. Apparently he did not do so, for if he had, he could not have failed to notice that the petitioner's testimony at the earlier hearing was far more lucid, compact, and responsive than his testimony at the later hearing. This deterioration is pertinent to his condition both in December 2005 and today, 22 months later.

It is 18 years since the murders, 15 years since the trial, and 14 years since the petitioner was sentenced to death, and the end of the legal proceedings is not yet in sight. We therefore direct that the limited further remand that we are ordering be conducted with dispatch. Whether the judge should receive additional evidence beyond live testimony by the experts will doubtless depend on the results of that examination, and so we neither direct nor forbid such further evidence gathering. If the judge decides that the petitioner is incompetent, he may wish to reexamine his April 2003 ruling that the

petitioner was competent to participate in the earlier stages of the habeas corpus proceeding, since the petitioner's role in assisting counsel would be larger in the district court than in the court of appeals, though as we said that the transcript of the earlier hearing is less suggestive of serious mental illness than the transcript of the December 2005 hearing. The fact that no expert evidence was presented at the earlier hearing would make it difficult to assess his condition then, but not necessarily impossible, since his psychiatric records go back many years.

We do not prejudge the remand. As the petitioner's lawyer concedes, the fact that a litigant is psychotic does not mean that he cannot assist in his case, *United States v. Teague*, 956 F.2d 1427, 1432 (7th Cir. 1992); *Eddmonds v. Peters*, 93 F.3d 1307, 1314 (7th Cir. 1996); *Smith v. Armontrout*, 865 F.2d 1502, 1506 (8th Cir. 1988) (en banc), especially at the appellate level. *United States v. Roberts*, 915 F.2d 889, 891-92 (4th Cir. 1990). Much of the time, even at the December hearing, the petitioner was lucid, even articulate. He has a good memory, at least a rudimentary familiarity with the legal process, knows who he is, where he is, etc.; and we take seriously the possibility voiced by Dr. Olive that the petitioner is malingering. If he is not malingering, however, he seems insanely preoccupied with a frivolous ground of appeal and oblivious to the other, more substantial, grounds that his lawyers wish to press, as well as severely distracted by fear of diabolical beings who are scheming against him, preventing him from reading any documents relating to his case. These matters require further exploration in the district court, pending which the appeals will remain on our docket.

REMANDED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*