# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 07-1148

DONALD CALLOWAY,

*Petitioner-Appellant,*

*v.*

JESSE MONTGOMERY,

*Respondent-Appellee.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 3241—**Elaine E. Bucklo,** *Judge.*

———————

ARGUED SEPTEMBER 28, 2007—DECIDED JANUARY 14, 2008

———————

Before ROVNER, WOOD, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* If a 42-year-old man wants to change his identity and fly through the remainder of his life under the radar screen with a fake name, what kind of name would he be likely to select? Certainly he would want a common name, like Walker, Washington, White, or Williams,[1] to name just a few that begin with the same letter. But Donald Calloway, the appellant in this

———————

[1] How popular are these four names? Well, the National Football League alone has 11 players named either White or Walker on current team rosters. A dozen players are named Washington. And there are 39 players with "Williams" on the back of their jerseys each weekend. See NFL.com.

federal habeas case, did not follow the conventional wisdom: his newly adopted name (in 1979) was Robert Ducks.[2] Twenty two years later, after "Robert Ducks" was indicted in federal court, "Donald Calloway" came back from the past. And it was quite a past.

In March of 1979, Calloway left a bar with his ex-wife, Margie Murray. The next day Murray's dead body was found behind an abandoned house in Harvey, Illinois. The bullet fragments investigators found in her skull came from a .32 caliber handgun later found in her home. A little later, her van turned up in Houston, Texas. Calloway disappeared into thin air, and an arrest warrant was issued for him in April of 1979.

In 2001,[3] "Robert Ducks" was indicted in federal court in Chicago on mail fraud charges. While the case was pending, but apparently after "Ducks" appeared in court a few times, a fingerprint check indicated that he was not who he claimed to be. In fact, he was Donald Calloway. After the Harvey, Illinois, police were notified, Calloway

---

[2] At least Donald Calloway also changed his first name, as "Donald Ducks" was apparently even too much for him. And, just to go back to the last footnote, there are no players in the NFL named either Duck or Ducks.

[3] It's a bit unnerving to consider just how much time passed between March of 1979, when Calloway disappeared, and December of 2001, when "Robert Ducks" was unmasked. In March of 1979, Jimmy Carter was the president, and the "Iran Hostage Crisis," which was to last 444 days, was still 8 months away. That was followed by the 8-year administration of President Reagan, the 4-year term of President George Herbert Walker Bush (#41), the 8-year presidency of Bill Clinton, the election of George W. Bush (#43) as president, and September 11, 2001, a day that changed America. That's a lot of time indeed.

was arrested and charged with the murder of Ms. Murray. Originally, "Ducks" denied that he was Calloway. Later, he admitted his true identity. He also gave two inconsistent statements to the police. But in both, he claimed that Murray pulled a gun from her purse, that a struggle followed, and that the gun discharged, hitting Murray. At Calloway's state murder trial, Dr. Shaku Teas testified as to the autopsy she performed on Murray's body. She found no stippling, i.e., "specks of gun powder embedded in the skin," which she said meant that the shot was fired from at least one foot away. She also testified that the angle of the gunshot was not consistent with a struggle. On the other hand, Calloway's expert said that a wig Murray wore might have prevented stippling and that the evidence was not inconsistent with a struggle. The jury rejected the murder charge but convicted Calloway on a lesser charge of voluntary manslaughter.

In the federal case against him, which was resolved before the state charge was tried, Calloway entered a guilty plea to mail fraud. The mail fraud conviction played a role in his sentencing in state court for manslaughter. The state trial judge held that the federal mail fraud conviction was equivalent to an Illinois conviction for theft by deception, which made Calloway eligible for an extended sentence. The maximum sentence for voluntary manslaughter, without the extension, was 7 years. With it, the maximum increased to 14 years. He received a sentence of 12 years.

On his direct appeal from the voluntary manslaughter conviction, Calloway argued, among other things, that the trial court violated his due process rights by refusing

to instruct the jury on involuntary manslaughter[4] and violated his Sixth Amendments rights—as clarified by *Apprendi v. New Jersey*, 530 U.S. 466 (2000)—by determining that his federal mail fraud conviction was equivalent to an Illinois conviction for theft by deception. The state appellate court rejected his claims and affirmed the conviction and sentence. The Illinois Supreme Court denied leave to appeal and the United States Supreme Court denied certiorari.

Calloway then filed the present petition for a writ of habeas corpus. The district court denied the petition but granted a certificate of appealability. In his appeal, he again claims that the state jury should have been instructed on involuntary manslaughter and that his rights under *Apprendi* were violated because the judge, not the jury, made the findings underlying the extended sentence.

Under the Antiterrorism and Effective Death Penalty Act of 1996, Calloway can obtain relief in federal court only if the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2). A state court decision is "contrary to" clearly established federal law if the court "applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or if the court "decides a case differently than [the Supreme Court] has done on a set of materially indistinguishable facts."

---

[4] The maximum sentence for involuntary manslaughter was 5 years, but 10 years if an extension were deemed to be appropriate.

*Williams v. Taylor*, 529 U.S. 362, 405 (2000); *Bell v. Cone*, 535 U.S. 685, 686 (2002). A decision of a state court which correctly identifies a governing legal rule established by the Court, but applies it unreasonably to the facts of a particular case, qualifies as a decision involving an unreasonable application of clearly established Federal law.

At first glance, it might seem as if the meaning of "clearly established law" should be self-evident and well-established, but even a brief look at a few cases shows it is not. For instance, last term the Court divided 5 to 4 in two Texas death penalty cases over the issue of what exactly was clearly established as to jury consideration of mitigating evidence. *See Abdul-Kabir v. Quarterman*, 127 S. Ct. 1654 (2007), and *Brewer v. Quarterman*, 127 S. Ct. 1706 (2007). The majority found that in both cases, the law regarding the presentation of mitigating evidence was clearly established. Chief Justice Roberts, dissenting in both, did not see the Court's prior precedents as clear at all. He thought the Court gave itself "far too much credit in claiming that our sharply divided, ebbing and flowing decisions in this area gave rise to 'clearly established' federal law." *Abdul-Kabir*, at 1676; *Brewer*, at 1715.

Relevant to the present case are discussions of how far principles of clearly established law can be extended. In determining whether a juvenile was in custody for *Miranda* purposes, the court of appeals had relied on the Supreme Court's emphasis on the importance of juvenile status in other contexts and concluded that youth should be a factor in the *Miranda* analysis. *Alvarado v. Hickman*, 316 F.3d 841 (9th Cir. 2002). Over three dissents, the Court rejected that attempt to meld two lines of cases into clearly established law. *Yarborough v. Alvarado*, 541 U.S. 652 (2004). More recently, *Carey v. Musladin*, 127 S. Ct. 649 (2006), involved a state court

decision which held that buttons displaying the victim's image, worn by the victim's family during trial, did not deny the defendant his right to a fair trial. The court of appeals determined that the state court decision was contrary to clearly established law set out in *Estelle v. Williams*, 425 U.S. 560 (1976), and *Holbrook v. Flynn*, 475 U.S. 560 (1986). *Musladin v. Lamarque*, 427 F.3d 653 (2005). The Supreme Court disagreed. The issue in *Williams* involved requiring a defendant to wear prison clothing at trial, and in *Flynn*, at issue was the presence of four uniformed state troopers immediately behind the defendant. These cases, the Court explained, did not provide clearly established law for Musladin's claim because both involved "state-sponsored courtroom practices" and that, on the other hand, the "spectator conduct" to which Musladin objected was "an open question in our jurisprudence." Justices Stevens, Kennedy, and Souter wrote separate concurrences in which each found the opinion's view of clearly established law to be overly restrictive.

It is in this context that we consider whether there is clearly established Supreme Court precedent for Calloway's claim that he was entitled to a jury instruction on the additional (recall, the jury already had one lesser offense option on the table) crime of involuntary manslaughter. We find there is not. It is true that in *Beck v. Alabama*, 447 U.S. 625 (1980), the Court concluded that the defendant was entitled to such an instruction. However, *Beck* was a capital case, and in a footnote the Court said, "We need not and do not decide whether the Due Process Clause would require the giving of such instructions in a noncapital case." At 638 n.14. Throughout the decision it is clear that the risk of a wrongful conviction for a capital crime informed the result. The risk "cannot be tolerated in a case in which the defendant's life is at stake." At 637. "[D]eath is a

different kind of punishment . . . ." *Id.*, quoting *Gardner v. Florida*, 430 U.S. 349, 357 (1977).

Even though, as Calloway points out, we have previously analyzed this issue by looking at whether the omission of the instruction resulted in a fundamental miscarriage of justice,[5] we now find that the *Beck* footnote requires us to conclude that on this issue in a noncapital case, there is no clearly established Supreme Court precedent.

Our conclusion is in accord with out recent decision in *Lockhart v. Chandler*, 446 F.3d 721 (7th Cir. 2006), in which we considered whether the state court violated petitioner's due process rights by failing to notify him before he entered a guilty plea that a mandatory 3-year term of supervised release would be added to his sentence. We found that there was no Supreme Court precedent on the issue and that, to the contrary, the Court had "expressly declined to decide such an issue in the very similar context of parole." At 724. The Court has also declined to consider lesser-included offenses in noncapital cases, such as this one.

Calloway's second claim is that his Sixth Amendment rights, as set out in *Apprendi*, were violated by the use of the federal mail fraud conviction to impose an extended sentence. In 1979, the time of the crime, Calloway's voluntary manslaughter conviction carried a maximum sentence of 7 years. Ill. Rev. Stat. 1979, ch. 38, par. 9-2(c) and par. 1005-8-1(a)(5). Under Illinois law, the sentence could be extended if a "defendant is convicted of any felony, after having been previously convicted in Illinois

---

[5] *See Reeves v. Battles*, 272 F.3d 918 (7th Cir. 2001); *Armstead v. Frank*, 383 F.3d 630 (7th Cir. 2004); and *Charlton v. Davis*, 439 F.3d 369 (7th Cir. 2006).

of the same or greater class felony, within 10 years . . . ." Ill. Rev. Stat. 1979, ch. 38, par. 1005-5-3.2(b). Voluntary manslaughter was a Class 2 offense. His sentence could be extended only for a prior conviction for a Class 2 or Class 1 felony. Calloway's sentence was extended from 7 to 12 years based on his conviction for federal mail fraud, which the court found to be the equivalent of the Illinois Class 1 felony—theft by deception.

He argues that because federal felonies are not divided into classes as are felonies under Illinois law, it was improper to use the mail fraud conviction as a basis for extending his sentence. Essentially, he says that under *Apprendi* he was entitled to a jury determination as to whether a federal mail fraud offense is the equivalent of an offense under the Illinois theft by deception statute. The Illinois Court of Appeals rejected his argument, and, on this issue as well, we must determine whether the court's decision was an unreasonable application of Supreme Court precedent.

In *Almendarez-Torres v. United States*, 523 U.S. 224 (1998), the Court determined that 8 U.S.C. § 1326(b)(2), which provides for the imposition of a higher sentence on an unlawfully returning alien who has a prior conviction, was a penalty provision. Because the provision did not create a separate crime, the government was not required to charge the fact of the earlier conviction in the indictment. Then came *Apprendi*, which determined that facts, other than the fact of a prior conviction, which increase the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. The recognition of the exception for a prior conviction kept *Almendarez-Torres* alive. In *Shepard v. United States*, 544 U.S. 13 (2005), the issue was what the trial judge could use to determine whether a burglary charge was for generic burglary—that is, burglary committed in an enclosed

space—and thus would be a violent felony for purposes of the Armed Career Criminal Act, 18 U.S.C. § 924(e). The Court concluded that the enquiry—made by the judge—was limited to "the terms of the charging document, the terms of a plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or to some comparable judicial record of this information." At 26.

The Illinois Appellate Court correctly stated and applied these principles in analyzing whether the mail fraud conviction was the equal of a conviction under Illinois law for theft by deception. The court looked to the statute and the plea agreement. It then properly looked to Illinois law to examine whether the facts would provide a basis for a charge of theft by deception. Because Illinois law specifically provides that a federal conviction that occurred in Illinois may be used to extend a sentence, *see People v. Harden*, 113 Ill. 2d 14 (1986), the court determined that there was no error in the use of the mail fraud conviction to extend Calloway's sentence. And in making this determination, the court did not run afoul of *Apprendi*. *Almendarez-Torres* still lives.

For these reasons, the judgment of the district court is AFFIRMED.

A true Copy:

      Teste:


_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*