In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 07-2093 and 07-2182

JOSEPH E. CORCORAN,

*Petitioner-Appellee,*
*Cross-Appellant,*

*v.*

EDWIN G. BUSS, SUPERINTENDENT,

*Respondent-Appellant,*
*Cross-Appellee.*

Appeals from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 05 C 389—**Allen Sharp**, *Judge.*

ARGUED DECEMBER 3, 2007—DECIDED DECEMBER 31, 2008

Before BAUER, WILLIAMS and SYKES, *Circuit Judges.*

BAUER, *Circuit Judge.* On July 26, 1997, Joseph Corcoran shot and killed four men: his brother Jim Corcoran, his sister's fiancé Robert Scott Turner, Timothy Bricker, and Doug Stillwell. An Indiana state court jury convicted Corcoran of four counts of murder. The trial court agreed

with the jury's determination and sentenced Corcoran to death. Corcoran exhausted his state court direct appeals and waived state post-conviction review. In 2005, Corcoran filed a petition for a writ of habeas corpus in the United States District Court for the Northern District of Indiana, claiming that his Sixth Amendment right to a jury trial was violated by an offer made by the State during pre-trial negotiations, which in turn tainted his death sentence. The district court granted his petition. The State now appeals the district court's grant of habeas relief; Corcoran cross-appeals from the district court's decision that Corcoran was competent to waive his state post-conviction proceedings. For the following reasons, we affirm the district court's finding of competence, but we reverse the grant of habeas relief.

## I. BACKGROUND

After Corcoran was indicted for four counts of murder under Ind. Code § 35-42-1-1, the State and Corcoran participated in extensive negotiations regarding the possibility of a plea agreement. The State made two offers: (1) a sentence of life without the possibility of parole in exchange for a plea of guilty, or (2) the dismissal of a request for the death penalty in exchange for Corcoran's agreement to proceed by bench trial instead of jury trial. Corcoran was advised by his counsel (during "several hundred" hours of meetings) that the offers were in his best interest for a number of reasons: (1) Corcoran had made a videotaped confession of the crimes; (2) his confession matched the physical evidence

at the crime scene; (3) two of the three court-ordered psychiatrists that evaluated Corcoran concluded that he was competent to stand trial and to aid in his defense; and (4) defense counsel planned to present no defense at trial. Corcoran could not give a specific reason why he was unwilling to accept either offer, stating "I just feel like I should go to trial," and that he could not explain why.[1] Negotiations lasted for approximately nine months, after which the State withdrew its offers and filed four applications for the death penalty.

Before trial, defense counsel gave notice to the court that an insanity defense would be asserted; after court-appointed doctors examined Corcoran and concluded that he was competent, defense counsel withdrew its claims. A jury found Corcoran guilty and recommended the death

---

[1] At the request of defense counsel, an experienced Indiana Public Defender met with Corcoran to make sure he understood the offer made by the State to dismiss the death penalty in exchange for agreeing to a bench trial. She explained to Corcoran that she was "unaware of any other capital murder defendant to whom the prosecution had extended a pre-trial offer to dismiss the death penalty without requiring a guilty plea in exchange," and that "he would still have the opportunity to present evidence and [argue] for a sentence less than life without parole, without facing the risk of a greater sentence." The defense also arranged a meeting between Corcoran and a Public Defender in Marion County, who discussed the logic of why the offers were in Corcoran's best interest. Despite the lengthy discussions, Corcoran offered no specific reason for rejecting the offers, other than he had a "feeling" that he should go to trial.

penalty. On August 26, 1999, the district court sentenced Corcoran to death.[2]

On direct appeal, Corcoran filed a written waiver of his right to appeal his convictions and challenged only his death sentence. Among the six claims that alleged the Indiana Death Penalty statute violated his state and federal constitutional rights, Corcoran argued that the statute violated his Sixth Amendment right to a jury trial in that when he declined the State's offer to proceed by a bench trial and chose to be tried by a jury, the State's request for the death penalty sought "to force [Corcoran] to abdicate a basic right," when the State actually believed that life imprisonment was the appropriate penalty. *Corcoran v. State*, 739 N.E.2d 649, 654 (Ind. 2000) (*Corcoran I*). The Indiana Supreme Court rejected all of Corcoran's arguments and upheld Indiana's Death Penalty statute as it applied to him. *Id.*

In addressing Corcoran's argument that his right to a jury trial was violated, the court emphasized that, under *Bordenkircher v. Hayes*, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d

---

[2]  At the time of Corcoran's sentencing, Indiana law required the trial judge make an independent determination of whether to impose the death sentence. Ind. Code § 35-50-2-9(e); *Lowery v. Anderson*, 225 F.3d 833, 842 (7th Cir. 2000). The statute was amended in 2002, in light of *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 256 (2002), to make the jury's decision final. See Act of Mar. 26, 2002, Pub.L. No. 117-2002, 2002-2 Ind. Acts 1734; *Ritchie v. State*, 809 N.E.2d 258, 263 n.1 (Ind. 2004).

604 (1978), although constitutional limits do apply, the discretionary power of a prosecutor to offer plea bargains is wide. The court found that in the context of plea bargaining, there is no material distinction in these discretionary powers to agree to a lesser sentence in exchange for a guilty plea or for a bench trial. *Corcoran I,* at 654. However, the court vacated Corcoran's sentence and remanded to the trial court, finding a "significant possibility that the trial court may have relied upon non-statutory aggravating factors in deciding whether to impose the death penalty" under Indiana law. *Id*. at 657 (citing *Harrison v. State*, 644 N.E.2d 1243 (Ind. 1995)). On September 30, 2001, the trial court reweighed the statutory aggravators under Ind. Code § 35-50-2-9(b)[3] and reinstated Corcoran's death sentence; the Indiana Supreme Court affirmed his sentence on September 5, 2002. *See Corcoran v. State*, 774 N.E.2d 495, 448-49 (Ind. 2002) (*Corcoran II*).

Corcoran was required to file a petition for post-conviction relief in state court by September 9, 2003. In what

---

[3]  The trial court relied upon the following aggravating circumstances: Corcoran was being tried in one proceeding for committing multiple murders; the murders were committed knowingly, intentionally, and in a particularly heinous way; and the mental disturbance suffered by Corcoran did not affect his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. The trial court also gave varying weight to mitigating circumstances, including the following: he was under the influence of a mental or emotional disturbance at the time of the murders; Corcoran's cooperation with authorities; his lack of criminal history; and his remorse.

would be the first in a series of flip-flops, he refused to sign his petition, believing that he should be put to death for his crimes. At the request of his counsel, a State Public Defender, the trial court scheduled a hearing in October, 2003, to determine whether Corcoran was competent to waive post-trial review of his conviction and sentence. Defense counsel sought the opinions of three mental health experts: clinical psychologist Dr. Robert G. Kaplan; forensic psychiatrist Dr. George Parker; and clinical neuro-psychologist Dr. Edmund Haskins. Each doctor separately interviewed Corcoran and reviewed his mental health records.

At the hearing, all three experts testified that Corcoran suffered from paranoid schizophrenia; the State and the post-conviction court acknowledged the same. According to the experts, symptoms of his disease included delusions that he had a speech disorder and a belief that prison guards were operating an ultrasound machine to torment him. On the basis of that diagnosis, the experts concluded that Corcoran was unable to make a rational decision concerning his legal proceedings. Each expert stated that Corcoran's decision to waive post-conviction review of his sentence, thereby hastening his execution, was premised on his desire to be relieved of the pain that he believed he was experiencing as a result of his delusions. The experts also stated that Corcoran had the capacity to understand his legal position, and Dr. Parker testified that Corcoran had a clear awareness of the status of his case and what was at stake if he waived further proceedings.

Additionally, Corcoran testified at the competency hearing, where the prosecutor and the trial judge questioned him. He stated that he understood it was his last chance at a review of the case, and that if it was unsuccessful, he would be executed. He told the judge that he never wanted a competency hearing, and that he wanted to waive his appeals because he was guilty of murder. He stated:

> I think I should be executed for what I have done and not because I am supposedly tortured with ultrasound or whatever. I am guilty of murder. I should be executed. That is all there is to it. That is what I believe. I believe the death penalty is a just punishment for four counts of murder.

In December, 2003, the post-conviction court found that Corcoran was competent to waive further challenges to his sentence and be executed. The court noted that:

> [the] evidence is clear that [Corcoran] suffers from a mental illness . . . [however the issue before the court was] whether he is competent to waive post-conviction review . . . [t]he dialogue the State and the Court had with [Corcoran] clearly indicate he is competent and understands what he is doing. While his choice of action may be unwise, and obviously against the advice of counsel, he is competent to make this ultimate decision in spite of his mental illness.

The Indiana Supreme Court affirmed the post-conviction court's competency determination. *See Corcoran v. State*, 820 N.E.2d 655, 662, *aff'd on reh'g*, 827 N.E.2d 542 (Ind. 2005) (*Corcoran III*); In doing so, the court considered: (1) the

testimony of the experts, each of whom concluded that
his decision to forego post-conviction review was prem-
ised on his desire to be relieved of the delusional pain he
was experiencing as a result of his mental illness; (2) the
fact that Corcoran did not tell any expert that he wished
to end his appeals in order to escape his delusions;
(3) his prison records and expert medical testimony
which revealed that his psychotic symptoms were being
controlled through various psychiatric medications;
(4) Corcoran's statements at the hearing that he wanted to
waive his appeals; and (5) evidence that Corcoran was
aware of his legal position and the consequences of his
decision, such as his own testimony at the hearing as
well as expert testimony that he was cognizant of his
sentence and the appeals process. The court concluded
that the evidence supported the trial court's determination
that Corcoran had "both a rational understanding of and
can appreciate his legal position . . . [and] the evidence
does not conclusively indicate that Corcoran's decision
was not made in a rational manner." *Id*. at 662.

On February 10, 2005, Corcoran changed his mind and
attempted to file a verified state post-conviction petition,
which was dismissed as untimely by the trial court; the
Indiana Supreme Court affirmed the trial court on April 18,
2006, stating that "[w]e have afforded Corcoran consider-
able review of his sentence . . . and the post-conviction
court's competency determination. The public interest in
achieving finality at this stage weighs heavily against
further review." *Corcoran v. State*, 845 N.E.2d 1019, 1023
(Ind. 2006) (*Corcoran IV*) (internal citations omitted).

On November 8, 2005, Corcoran filed an untimely petition for a writ of habeas corpus with the United States District Court for the Northern District of Indiana, raising eight claims that his constitutional rights had been violated by the proceedings that resulted in his conviction and death sentence. On December 5, 2005, Corcoran again changed his mind and filed a pro se "Petition to Halt All Future Appeals," in which he indicated that he did not wish to further challenge his convictions and sentence. On March 31, 2006, Corcoran sent a letter to the district court, stating that he only signed the post-conviction petition (filed on February 10, 2005) because he believed the Indiana Supreme Court would find him competent. He further stated that he never intended to appeal his sentence, and that he had consented to the filing of the habeas petition in acquiescence to the requests of his wife and his attorneys. He also told the court that he fabricated the story about being tortured by an ultrasound machine in prison, and he denied that his sleep disorder was a motivation to give up on appeal. Corcoran asked the district court to accept the Indiana Supreme Court's finding that he was competent, and in essence, deny his habeas petition.

Against Corcoran's wishes, on April 9, 2007, the district court granted Corcoran's petition for habeas relief under 28 U.S.C. § 2254(d), finding the Indiana Supreme Court's holding in *Corcoran I* that the offer was within "the discretionary powers of the prosecutor" violated Corcoran's right to a jury trial under *United States v. Jackson*, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968), which held that a provision of the Federal Kidnapping Act, 18 U.S.C.

§§ 1201 and 1202, that reserved the possibility of the death penalty exclusively for defendants who insisted on a jury trial, imposed an impermissible burden on the right to a jury trial. The district court considered both of the State's offers in adjudicating the present petition, and found that while the first offer to waive the death penalty in exchange for a guilty plea was well within prosecutorial discretion, the second offer sought to coerce Corcoran into waiving his right to a jury trial, and as such, was "objectively unreasonable" under the United States Supreme Court's decision in *Jackson*. *Corcoran v. Buss*, 483 F.Supp.2d 709, 723-24 (N.D.Ind. 2007) (*Corcoran V*). The district court distinguished *Bordenkircher* from the instant case, by finding that the State's second offer could not be considered in the context of plea negotiations, for the offer did not seek an admission of guilt. The district court also found that the Indiana Supreme Court, in *Corcoran III*, reasonably concluded that Corcoran was competent to waive his state post-conviction remedies. The court granted Corcoran's petition and ordered the State of Indiana to re-sentence Corcoran to a sentence other than death within 120 days. *Corcoran V*, at 734. The State appealed the grant of the habeas petition to this Court; Corcoran filed a cross-appeal, challenging the district court's conclusion that he was competent to waive his right to post-conviction review.

## II. ANALYSIS

Federal courts are authorized to grant a writ of habeas corpus when an individual is held in custody under a state court decision in violation of the United States Constitution. "We review the district court's findings of fact for clear error and its legal conclusions, as well as mixed questions of law and fact, *de novo*." *Rizzo v. Smith*, 528 F.3d 501, 505 (7th Cir. 2008). In doing so, we, like the district court, must evaluate the decision of the last state court to have adjudicated Corcoran's claim on the merits according to the standards set forth in 28 U.S.C. § 2254(d). *Williams v. Bartow*, 481 F.3d 492, 497-98 (7th Cir. 2007). We will not grant a writ of habeas corpus unless the state court decision (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d); *Johnson v. Loftus*, 518 F.3d 453, 456 (7th Cir. 2008) (citing *Williams v. Taylor*, 529 U.S. 362, 376, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)).

In determining whether the district court was correct in granting Corcoran's habeas petition, we must first identify the "clearly established Federal law" that Corcoran argues was offended by the Indiana state court decision. *Searcy v. Jaimet*, 332 F.3d 1081, 1087 (7th Cir. 2003). We then determine "whether the state court's decision was either 'contrary to' or 'involved an unreasonable application of' those legal principles." *Id*. at 1088. A decision is

"contrary to" federal law when the state court applies a rule that contradicts the governing law set forth in Supreme Court cases, or if the state court decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405-06, 120 S.Ct. 1495 (quotations omitted); *Calloway v. Montgomery*, 512 F.3d 940, 943 (7th Cir. 2008). An "unreasonable application" of clearly established federal law in the habeas context is more than an "incorrect" application. *Woods v. McBride*, 430 F.3d 813, 817 (7th Cir. 2005) ("[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.") (citing *Williams*, 529 U.S. at 411, 120 S.Ct. 1495). "Rather, in order to trigger grant of the writ, the state court decision must be both incorrect and unreasonable." *Id.* at 817; *see also Johnson*, 518 F.3d at 456 (noting that the Supreme Court has "recently reemphasized that a state court's application of clearly established law is acceptable, even if it is likely incorrect, so long as it is reasonable") (citing *Wright v. Van Patten*, __ U.S. ___, 128 S.Ct. 743, 169 L.Ed.2d 583 (2008)). In assessing the reasonableness of the Indiana Supreme Court's decision, we presume that its factual determinations are correct, unless clear and convincing evidence to the contrary rebuts them. 28 U.S.C. § 2254(e)(1); *Mack v. McCann*, 530 F.3d 523, 533 (7th Cir. 2008).

## A. Right to Jury Trial

We begin with Corcoran's contention that the State sought to "unconstitutionally chill or squelch the asser-

tion of his right to a jury trial by penalizing Corcoran with a death sentence for exercising that right," which was contrary to or an unreasonable application of the "bright-line" rule in *Jackson*.

In *Jackson*, the Supreme Court construed a provision of the Federal Kidnapping Act, 18 § 1201(a), to allow for the imposition of the death penalty only upon the recommendation of a jury after a guilty verdict, whereas the maximum penalty for a defendant who pled guilty or waived a jury and was tried in a bench trial, was life imprisonment. The Court struck down the provision, finding that it reserved the possibility of the death penalty exclusively for defendants who insisted on a jury trial and therefore imposed an impermissible burden on their right to a jury trial because it "chill[s] the assertion of constitutional rights by penalizing those who choose to exercise them." *Jackson*, 390 U.S. at 581, 88 S.Ct. 1209. The Court reasoned that the inevitable effect of the provision would be to discourage the assertion of the Fifth Amendment right not to plead guilty and to deter the exercise of the Sixth Amendment right to a jury trial. "[T]he evil in the federal statute is not that it necessarily coerces guilty pleas and jury waivers but simply that it needlessly encourages them." *Id*. at 583, 88 S.Ct. 1209.

In the wake of *Jackson*, the Supreme Court has consistently held that *Jackson* does not stand for the proposition "that the Constitution forbids every government-imposed choice in the criminal process that has the effect of discouraging the exercise of constitutional rights." *See e.g., Chaffin v. Stynchcombe*, 412 U.S. 17, 29, 93 S.Ct. 1977, 36

L.Ed.2d 714 (1973) (discussing cases). In *Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970), a petitioner pleaded guilty and was sentenced to 50 years' imprisonment after being indicted under the Federal Kidnapping Act (the same statute at issue in *Jackson*). The petitioner argued that his guilty plea was involuntary, and therefore invalid under *Jackson*, since, according to the petitioner, every guilty plea entered under the Act before *Jackson* was invalidated by *Jackson*. The Court concluded that the petitioner "read far too much into the *Jackson* opinion . . . *Jackson* prohibits the imposition of the death penalty under § 1201(a), but that decision neither fashioned a new standard for judging the validity of guilty pleas nor mandated a new application of the test . . . that guilty pleas are valid if both 'voluntary' and 'intelligent.'" *Brady*, 397 U.S. at 746-47, 90 S.Ct. 1463; *see also North Carolina v. Alford*, 400 U.S. 25, 31, 91 S.Ct. 160, 27 L.Ed.2d 427 (1970) ("*Jackson* established no new test for determining the validity of guilty pleas.").

The Supreme Court continued to reaffirm "the permissibility of plea bargaining even though 'every such circumstance has a discouraging effect on the defendant's assertion of his trial right,' because the imposition of these difficult choices [is the] inevitable attribute of any legitimate system which tolerates and encourages the negotiation of pleas." *Corbitt v. New Jersey*, 439 U.S. 212, 219 n. 9, 99 S.Ct. 492, 58 L.Ed.2d 466 (1978) (quoting *Chaffin*, 412 U.S. at 31, 93 S.Ct. 1977). In *Bordenkircher v. Hayes*, the prosecutor offered to forego a habitual criminal count if the defendant pleaded guilty, in which event the mandatory life sentence would have been avoided. The defendant

refused the offer, went to trial on an indictment that included a count requiring mandatory life imprisonment, and a jury found him guilty. The Court upheld the conviction, holding that the State's offer did not violate due process because it had "no more than openly presented the defendant with the unpleasant alternatives of forgoing trial or facing charges on which he was plainly subject to prosecution," and emphasizing that "[t]o punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort, [and] for an agent of the State to pursue a course of action whose objective is to penalize a person's reliance on his legal rights is 'patently unconstitutional.'" *Id*. at 365, 368, 98 S.Ct. 663. But "in the give-and-take of plea bargaining, there is no such element of punishment or retaliation as long as the accused is free to accept or reject the prosecution's offer." *Id*. at 363, 365, 98 S.Ct. 663 (internal citations omitted).

"[B]y tolerating and encouraging the negotiation of pleas, [the Supreme] Court has necessarily accepted as constitutionally legitimate the simple reality that the prosecutor's interest at the bargaining table is to persuade the defendant to forgo his right to plead not guilty." *Id*. at 364, 98 S.Ct. 663. Under *Bordenkircher* and its progeny, "the Supreme Court has applied a presumption of vindictiveness 'exclusively in the *post-trial* context,' and has specifically considered and rejected claims that a presumption is applicable when, following failed [*pre-trial*] plea negotiations, additional charges are brought against a defendant." *Williams*, 481 F.3d at 504 (analyzing *Bordenkircher*) (emphasis added) (internal citation omitted); *see also United States*

*v. Warda*, 285 F.3d 573, 580 (7th Cir. 2002) ("The classic instance triggering the presumption [of vindictiveness] is the one in which the same judge tries and sentences a person for a second time after he has succeeded in having his original conviction reversed.").[4]

Corcoran's attempt to equate the offer to waive his right to jury trial *during pre-trial negotiations* to a defendant who chose to exercise a legal right (*in a post-trial setting*) to attack his original conviction is an unreasonable interpretation of *Bordenkircher*, and the district court erred in accepting it.

Consequently, we have found no authority from the Supreme Court that provides support for the district court's decision that *Jackson* clearly established a rule that stands for the proposition that during pre-trial negotiations, a prosecutor cannot offer to forgo the death penalty in exchange for a bench trial.[5] The Court has squarely held that a State may encourage a guilty plea by

---

[4] Corcoran does not argue that the State was vindictive in its decision to seek the death penalty.

[5] We also note that the condemned provision of the Federal Kidnapping Act in *Jackson* provided in effect that a defendant could not be sentenced to death if he pled guilty, but faced a significant likelihood of capital punishment if he went to trial. However, the Indiana Death Penalty statute, which applies to Corcoran's state law murder convictions, permits a defendant to be sentenced to death, whether he pleads guilty, proceeds by bench trial, or proceeds by jury trial. *See* Ind. Code. § 35-50-2-9(a)-(d); *Smith v. State*, 686 N.E.2d 1264, 1271 (Ind. 1997).

offering substantial benefits in return for the plea, including an offer to forego seeking the death penalty. *See Corbitt*, 439 U.S. at 218, 99 S.Ct. 492. By making the second offer, the prosecutor merely tried to induce Corcoran to give up a right by agreeing to lenient treatment for Corcoran. Because it is clearly established law that a prosecutor may offer a "recommendation of a lenient sentence or a reduction of charges" as part of the plea bargaining process, we believe the Indiana Supreme Court correctly analyzed Corcoran's claim in the context of plea-bargaining under *Bordenkircher*.

As for the district court's conclusions that the State's second offer could not be considered a plea bargain since Corcoran was asked not for an admission of guilt, but rather to waive his right to a jury trial, these contentions have no basis for support in *Jackson* or elsewhere. First, the Supreme Court has upheld pleas that do not include an admission of guilt, commonly referred to as "*Alford* pleas." *See generally Alford*, 400 U.S. 25, 91 S.Ct. 160. Further, while we believe that the State's second offer to forego the death penalty if Corcoran tried his case to the bench may be uncommon, the Supreme Court has long instructed that plea agreements may waive constitutional or statutory rights, most pertinently the right to a jury trial. *Boykin v. Alabama*, 395 U.S. 238, 243, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969); *see New York v. Hill*, 528 U.S. 110, 117, 120 S.Ct. 659, 145 L.Ed.2d 560 (2000) ("We allow waiver of numerous constitutional protections for criminal defendants that also serve broader social interests."); *Godinez v. Moran*, 509 U.S. 389, 397 n.7, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993) ("A criminal defendant waives three

constitutional rights when he pleads guilty: the privilege against self-incrimination, the right to a jury trial, and the right to confront one's accusers.") (citing *Boykin*, 395 U.S. at 243, 89 S.Ct. 1709). A criminal defendant may waive these fundamental protections afforded by the Constitution, so long as that waiver is made "knowing[ly], intelligent[ly], [and] with sufficient awareness of the relevant circumstances and likely consequences." *Ruiz v. United States*, 536 U.S. 622, 629, 122 S.Ct. 2450, 153 L.Ed.2d 586 (2002) (citing *Brady*, 397 U.S. at 748, 90 S.Ct. 1463); *Corbitt*, 439 U.S. at 218-19, n.9, 99 S.Ct. 492 (footnote omitted) (emphasizing that "*Jackson* had in no way altered the test of *Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969) that guilty pleas are valid if knowing, voluntary, and intelligent."). A defendant may waive many other fundamental protections along with the right to a jury trial, in the context of plea negotiations, such as: the right to view impeachment information relating to any informants or other witnesses, *see Ruiz*, 536 U.S. at 629, 122 S.Ct. 2450, and *United States v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975); the right to an indictment, a trial, and an appeal (also known as a "fast-track" plea bargain), *see Ruiz*, 536 U.S. at 629, 122 S.Ct. 2450; the right to prevent the admission of statements during plea negotiations under Federal Rule of Evidence 410 and Federal Rule of Criminal Procedure 11(e)(6), *see United States v. Mezanatto*, 513 U.S. 196, 115 S.Ct. 797, 130 L.Ed.2d 697 (1995); the right to collaterally attack a sentence, *see United States v. Broce*, 488 U.S. 563, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989); the right to a double jeopardy defense, *Ricketts v. Adamson*, 483 U.S. 1,

107 S.Ct. 2680, 97 L.Ed.2d 1 (1987); the right to counsel, *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); and the right to appeal, *see United States v. Hare*, 269 F.3d 859, 861 (7th Cir. 2001).

During the pre-trial negotiations, the State *and* Corcoran's counsel attempted to convince Corcoran to plead guilty, or in the very least, proceed by bench trial, due to the overwhelming evidence against him. If it is constitutionally permissible to use the threat of more severe punishment to encourage a guilty plea, where a defendant gives up most of his rights, it should follow that the State's use of the same tactics to encourage a defendant to proceed by bench trial would also be constitutionally permissible, where he would have an opportunity to present evidence and cross-examine witnesses— rights that would not otherwise be able to assert had Corcoran pleaded guilty. At the very least, *Jackson* does not render an offer like this impermissible or unconstitutional. Obviously, a jury trial is more burdensome than a bench trial for the State. But even in a bench trial, the State must present its full case against the defendant, and in turn, the defendant is entitled to offer a full defense. *United States v. Goodwin*, 457 U.S. 368,383, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982) ("A prosecutor has no 'personal stake' in a bench trial and thus no reason to engage in 'self-vindication' upon a defendant's request for a jury trial.").

"Defendants advised by competent counsel and protected by other procedural safeguards are presumptively capable of making an intelligent choice in" accepting or rejecting the offer. *Bordenkircher*, 434 U.S. at 363, 98 S.Ct.

663 (citing *Brady*, 397 U.S. at 758, 90 S.Ct. 1463). Indeed, counsel for Corcoran spent several hundred hours discussing his plea options, and acknowledged the overwhelming evidence against Corcoran and the generous nature of the State's offers in light of the evidence. Defense counsel even brought in other attorneys to speak with Corcoran to discuss the offers, and how, even though the offer to forego death in exchange for a bench trial had "never been heard of," it still gave Corcoran the option of presenting arguments and evidence to the court. A party in a criminal proceeding who does not like the terms of an offered plea bargain can refuse to accept them it "by spurning the offer and going to trial." *Hare*, 269 F.3d at 862. Corcoran took this route, which involved risking a death sentence should he lose at trial.

Given the amount of evidence complied against Corcoran that he was responsible for the murders, including his own videotaped confession and the lack of defense that his counsel had available at trial, the State did not needlessly punish (under *Jackson*) Corcoran's right to a jury trial by making an offer to forego asking for death if he chose a bench trial. "A prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of societal interest in prosecution." *Goodwin*, 457 U.S. at 382, 102 S.Ct. 2485. The Indiana Supreme Court's conclusion that the State's offer did not violate Corcoran's constitutional rights does not "l[ie] well outside the boundaries of permissible differences of opinion." *See Ward v. Sternes*, 334 F.3d 696, 703 (7th Cir. 2003). The decision was neither incorrect nor unrea-

sonable to warrant the district court's grant of Corcoran habeas petition.

### B. Competency to Waive Post-Conviction Review

Corcoran cross appeals the district court's holding that Corcoran was competent to waive his post-conviction proceedings. Corcoran argues that the Indiana Supreme Court's conclusion that Corcoran was competent to waive post-conviction review was unreasonable and made despite clear evidence to the contrary. As we noted above, a federal court may set aside a state court's "decision that was based on an unreasonable determination of the facts in light of the evidence presented," and a federal court may not overturn a state court's factual determinations unless it concludes that they are not "fairly supported by the record." § 2254(d)(2), (8); *Demosthenes v. Baal*, 495 U.S. 731, 735, 110 S.Ct. 2223, 109 L.Ed.2d 762 (1990) (per curiam). The Supreme Court has held that a state court's conclusion regarding a defendant's competency is entitled to such a presumption. *Demosthenes*, 495 U.S. at 735, 110 S.Ct. 2223.

The petitioner has a "tougher row to hoe" when challenging his competence in postconviction proceedings than when he is challenging his competence to stand trial. *Holmes v. Buss*, 506 F.3d 576, 579 (7th Cir. 2007). Under *Rees v. Peyton*, 384 U.S. 312, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966), when determining a petitioner's mental competence to forego judicial proceedings, a court must ask "whether he has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning

further litigation," or "whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." 384 U.S. at 314, 86 S.Ct. 1505; *Wilson v. Lane*, 870 F.2d 1250, 1254 (7th Cir. 1989); *see also Holmes v. Buss*, 506 F.3d 576, 579 (7th Cir. 2007) ("If . . . the question is whether a petitioner for habeas corpus who has been sentenced to death is competent to withdraw a petition for certiorari filed on his behalf challenging the denial of habeas corpus, . . . the answer is unlikely to require that he understand more than that the withdrawal of his petition will almost certainly terminate any legal challenge to his death sentence.") (internal citations omitted).

Corcoran believes the record clearly established that his decision to waive his rights was not based on "rational thinking" as discussed in *Rees*. He argues that three medical experts testified that he suffered from a mental illness and that his decision to waive any further appeal of his sentence was the product of the delusions and pain he was experiencing as a result of his illness. Corcoran also contends that the Indiana Supreme Court erred in finding that he was aware of his legal position and the consequences of his waiver.

The Indiana Supreme Court gave careful consideration of all the evidence presented at the post-conviction hearing. The court acknowledged that the experts testified that Corcoran suffered from paranoid schizophrenia and his resulting delusions caused him to waive further review of his sentence, but the court also found that Corcoran had a clear awareness of the status of his

case and what was at risk if he waived further review. The court took into account Corcoran's own conduct and testimony at the hearing, in which he stated that his decision to waive further proceedings was based on his remorse for his crime, and not on any "delusions" he was said to have been experiencing. Although the experts believed otherwise, the Indiana Supreme Court was entitled to accept Corcoran's contention that his request to waive further proceedings was based on his belief that death is a just punishment for his crimes. *See United States v. Collins*, 949 F.2d 921, 926 (7th Cir. 1991) (finding that statements of the defendant are appropriate evidence for the court to consider when evaluating competency). The Indiana Supreme Court has recognized that "[w]hile most people consider death the ultimate penalty, some murderers faced with life imprisonment may rationally disagree." *Smith v. State*, 686 N.E.2d 1264, 1273 (Ind. 1997) (considering a defendant's preference for death over life imprisonment, where there was an indication of his desire not to spend the rest of his life in prison and noting that to do so is not "per se irrational"); *see also Wilson v. Lane*, 870 F.2d 1250, 1254 (7th Cir. 1989) (in affirming a district court's finding of a death row inmate's competency to waive further appeals even though the inmate was ruled mentally incompetent, the Court considered the inmate's unwavering testimony that he was aware of his position and of the federal review options available to him, and that he based his decision not on the conditions of his confinement, but on his belief that death was a better option than life in prison).

Further, under the *Rees* standard, there is no support for Corcoran's contention that a petitioner who has

been diagnosed with a mental illness is not competent to waive post-trial proceedings. The question under *Rees* is whether a mental illness substantially affects the capacity to appreciate his options and make a rational choice among them. *See Whitmore v. Arkansas*, 495 U.S. 149, 166, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990) (citing *Rees*, 384 U.S. at 314, 86 S.Ct. 1505); *see also Dennis v. Budge*, 378 F.3d 880, 889-92 (9th Cir. 2004) (rejecting the claim that under *Rees*, a prisoner on death row should not be allowed to waive his post-conviction remedies if there is any possibility that the decision is a product of a mental disease, disorder or defect); *Smith v. Armontrout*, 812 F.2d 1050, 1057 (8th Cir. 1987) ("It is very probable that in every case where a death-row inmate elects to abandon further legal proceedings, there will be a possibility that the decision is the product of a mental disease, disorder, or defect . . . [y]et *Rees* clearly contemplates that competent waivers are possible.").

Our review of the transcripts and the evidence before the Indiana Supreme Court reveals that it (as well as the two other courts that considered Corcoran's competency) thoroughly and conscientiously examined Corcoran's claims of incompetency, and its findings that he had a "rational understanding of and [could] appreciate his legal position" are factually supported by the record. Therefore, because the Indiana Supreme Court's decision was based on a reasonable determination of the facts in light of the evidence, we defer to the determination of the Indiana Supreme Court that Corcoran was competent.

### III.  CONCLUSION

The district court's finding that Corcoran was competent to waive his post-conviction proceedings is AFFIRMED. However, the decision of the district court to grant Joseph Corcoran habeas relief is REVERSED and REMANDED with instructions to deny the writ, and the State of Indiana is at liberty to reinstate the death penalty.

WILLIAMS, *Circuit Judge,* concurring in part and dissenting in part. I agree with the majority regarding Corcoran's Sixth Amendment claim, and I join that part of the opinion. However, I disagree with my colleagues' conclusion that Corcoran was competent to waive postconviction review.

No one contests that Corcoran suffers from a mental illness. This is clear from his delusion that prison guards torture him daily with an ultrasound machine, his conversations with individuals who are not there, and his delusion that he suffers from an involuntary speech disorder. The question now is whether the Indiana state court was reasonable in finding that despite his illness, Corcoran was able to make a rational choice with respect to waiving any further appeal of his death sentence. *See Ward v. Sternes*, 334 F.3d 696, 703 (7th Cir. 2003).

The Indiana Supreme Court determined he was able to make a rational choice—one not driven by a desire to escape his delusions—based on three reasons. Because two of those reasons are directly contradicted by the record, however, I believe the Indiana court's decision finding waiver under these circumstances was unreasonable error.

Under 28 U.S.C. § 2254(d), the court can grant a writ of habeas corpus only where state court adjudication: (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court"; or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See also Williams v. Taylor*, 529 U.S. 362, 376 (2000). Corcoran must offer clear and convincing evidence to rebut the presumption that the Indiana Supreme Court's competency finding was correct. § 2254(e)(1).

The Indiana Supreme Court correctly identified *Rees* as the governing standard. *Rees v. Peyton*, 384 U.S. 312, 314 (1966) (per curiam). In *Rees*, the Supreme Court articulated the following legal standard to be applied when a death row inmate seeks to forego further proceedings: "whether he has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." *Id.* Although the Indiana Supreme Court used

the correct standard, it made an unreasonable determination of the facts in light of the evidence presented.

The three experts who testified in the competency hearing unanimously concluded that Corcoran suffers from paranoid schizophrenia that renders waiver of further appeal of his death sentence impossible because the illness prevents him from making rational decisions. *Corcoran v. State,* 820 N.E.2d 655, 660, *aff'd on reh'g*, 827 N.E.2d 542 (Ind. 2005) (*Corcoran III*). All three experts interviewed Corcoran for several hours, reviewed his medical and prison records, his pre-sentencing memorandum, numerous prior mental health evaluations, and correspondence between Corcoran and his sister. Additionally, one of the experts conducted interactive and written tests. They all agreed that Corcoran was not capable of making a rational waiver decision because he suffered from paranoid delusions and those served as the basis of his decision to waive postconviction relief. The doctors explained that Corcoran suffered from the delusion that prison guards tortured him with sound waves causing his body to twitch and the delusion that he suffered from an involuntary speech disorder. *See* Competency Hr'g Tr. 12, Oct. 21, 2003.

Despite this evidence, the Indiana court concluded that Corcoran had the capacity to make a rational choice on the following grounds:

> Corcoran . . . made no statement to any of the experts evaluating him indicating that he wished to end his appeals in order to escape his paranoid delusions. Corcoran's prison medical records and the testimony

of each expert indicated that his psychotic symptoms were being controlled through various psychiatric medications. Corcoran himself spoke directly to his reasons for not pursuing post-conviction review and the contention that his delusions were prompting his actions at the post-conviction hearing.

*Corcoran III,* 820 N.E.2d at 660 (footnote omitted).

The problem with the conclusion that Corcoran had the capacity to make a rational choice is that two of the court's three reasons are directly contradicted by the evidence presented. *See Mendiola v. Schomig*, 224 F.3d 589, 592 (7th Cir. 2000) ("If a state court's finding rests on thin air, the petitioner will have little difficulty satisfying the standards for relief under § 2254."). First, the court reasoned Corcoran never told any of the experts that he wanted to die to escape his delusions. That is not true. Second, the court stated that each expert indicated Corcoran's medication controlled his psychotic symptoms. That also is not true. The court also relied on Corcoran's own testimony, but the court failed to consider Corcoran's testimony in light of his delusions.

The court's first reason for finding Corcoran capable of making a rational choice was that Corcoran never told any expert that he wanted to die to escape his delusions. This statement was wrong, however, because Corcoran <u>did</u> tell Dr. Kaplan that he wanted to die in order to escape the

delusions, some of which he said caused him pain.[1] Dr. Kaplan explicitly testified that during his meeting with Corcoran, Corcoran told him he wanted to be put to death because "he wanted to be released from the quote, unquote, pain and suffering of his involuntary speech disorder which really doesn't exist." Competency Hr'g Tr. 19. The experts all agree that Corcoran does not suffer from a speech disorder, but that his delusion causes him to believe he does. *Id.* at 62.

Second, the record directly contradicts the court's finding that each expert indicated that Corcoran's medication controlled his psychotic symptoms. Dr. Kaplan explicitly testified that Corcoran's medication did not have a significant effect on controlling his paranoia and delusions. *Id.* at 34. Moreover, Dr. Kaplan was the only one of the three experts who was asked to testify about the effects of Corcoran's medication. When he did, Dr. Kaplan acknowledged that Corcoran benefitted from taking his antipsychotic medications, but stated that even when

---

[1] I also note that Dr. Haskins testified that Corcoran wanted to bring about his own death "[i]n order to escape from his supposed . . . persecution and the control of the guards and his discomfort over this delusion about speaking involuntarily." Competency Hr'g Tr. 68. It is not clear from Dr. Haskins's testimony whether he learned of these reasons only through Corcoran's correspondence or through his interview with Corcoran or a combination of both. But even with Dr. Haskins's testimony aside, Corcoran clearly told Dr. Kaplan he wished to die to escape his involuntary speech disorder.

medicated "it didn't appear that at any time he was not paranoid or not delusional." *Id.* at 34. Dr. Kaplan further testified that medical records revealed that even after Corcoran took a "very high dose" of an antipsychotic medication in prison he continued to suffer from paranoia and auditory hallucinations. *Id.* at 24. I also note that the postconviction trial court had made the same incorrect finding that testimony at the hearing showed that Corcoran's medication controlled his symptoms. This is significant because the Indiana Supreme Court gave a high level of deference to the trial court's conclusion. *Corcoran III*, 820 N.E.2d at 660.

The Indiana Supreme Court unreasonably concluded that Corcoran had the ability to make a rational choice based on these two erroneous factual premises. "[E]ven a partial reliance on an erroneous fact finding can support a finding of unreasonableness." *Ben-Yisrayl v. Buss*, 540 F.3d 542, 550 (7th Cir. 2008) (discussing *Wiggins v. Smith*, 539 U.S. 510, 528 (2003)); *see also Mendiola*, 224 F.3d at 592-93 (state court's finding should be supported by the record). This leaves only the third reason provided by the court—Corcoran's own testimony.

The Indiana Supreme Court stated that based on Corcoran's testimony at the competency hearing, it was clear that Corcoran understood the nature of the proceedings, the responsibilities of counsel, and the nature of the appellate procedure. *Corcoran III*, 820 N.E.2d at 661. The court relied very heavily on Corcoran's statement that, "I want to waive my appeals because I am guilty of murder. I think that I should be executed for what I have

done and not because I am supposedly tortured with ultrasound or whatever . . . I believe the death penalty is a just punishment for four counts of murder," as an indication that Corcoran could appreciate his position and make a rational choice. *Id.* at 660-61.

The majority reasons that the Indiana Supreme Court was entitled to believe Corcoran's contention that he wished to waive further proceedings because of his guilt, and I agree that ordinarily, the Indiana court's decision to rely on one person's testimony over other people's testimony would be one to which we would defer. *See Herrera v. Collins*, 506 U.S. 390, 400-01 (1993) ("upon habeas corpus the court will not weigh the evidence") (citation omitted). But this is not a case where the court picked the opinion of one expert who believed Corcoran could make a rational decision over an expert who disagreed. Indeed, the State presented no expert who contradicted the conclusions of these three experts. Rather, the person whom the court credited was a person diagnosed with a severe mental illness that causes delusions, who told a doctor and his sister he wanted to die to escape those delusions. The medical experts who evaluated Corcoran testified he purposely downplays his illness and is intelligent enough to know how to hide his psychosis. In fact, Dr. Parker stated that Corcoran "would rather be executed than admit that schizophrenia might be contributing to his desire to die." Those experts all testified that Corcoran's illness has a direct bearing on his thought process and renders him incapable of making a rational choice. The Indiana Supreme Court acknowl-

edged the experts' testimony regarding Corcoran's delusions but it did not discuss his decision to waive postconviction review in light of his delusions.[2]

But even if the Indiana Supreme Court could have relied on its own judgment over the opinions of the experts in this case, the factual inaccuracies of the court's two other reasons render its entire finding infirm. *See, e.g., Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude that the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence.").

The court determined that medication controlled Corcoran's delusions and that the only reason Corcoran himself had ever given for wanting to waive further proceedings was his guilt. This might be a different case if those determinations were true. Because both determinations are directly contradicted by the record, however, I believe the Indiana Supreme Court's finding is not "fairly supported by the record"; instead, the record clearly

---

[2] Corcoran's own words later in the competency hearing further belie the conclusion that he understood and rationally made the choice to waive postconviction relief. At the close of the hearing, Corcoran asked the judge what would happen if he found Corcoran incompetent. The judge explained that the court would then proceed on the postconviction petition filed by his attorneys. If Corcoran understood his position and possessed the ability to make a rational choice among his options, it would seem he would have understood the proceedings that had just taken place.

contradicts it. *Cf. Demosthenes v. Baal*, 495 U.S. 731, 735 (1990) (per curiam) (upholding state court finding that inmate was competent to waive his right to pursue postconviction relief where three psychiatrists determined he was competent). "The [habeas] standard is demanding but not insatiable . . . [d]eference does not by definition preclude relief." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (citation omitted).

For this reason, I would reverse the district court's finding that Corcoran was competent to waive his postconviction proceedings and grant Corcoran a conditional writ of habeas corpus requiring litigation of Corcoran's postconviction petition in state court. I respectfully dissent.